In re GRAND JURY PROCEEDINGS.

Robert M. McCoy and Charles Sussman, Appellants.

No. 79–1671.

United States Court of Appeals, Fifth Circuit.

Aug. 7, 1979.

---

Albert J. Datz, Jacksonville, Fla., for appellants.

Ernst D. Mueller, Asst. U. S. Atty., Jacksonville, Fla., for appellee.

Before GOLDBERG, FAY and RUBIN, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Robert M. McCoy, who had been engaged in business as a customshouse broker, and Charles Sussman, an accountant employed by McCoy's lawyer to analyze some of McCoy's records, appeal from judgments that they were each guilty of contempt for refusing to comply with grand jury *subpoenas duces tecum* requiring, in sweeping terms, the production of numerous documents and records relating to McCoy's business and analyses of them prepared by Sussman. Considering the objections raised by McCoy, we conclude that some of the documents requested were records of a business legally required to be kept. However, McCoy's subpoena was so unqualified and pervasive in scope that it required him to determine at his peril what documents he was required to produce.

The subpoena served on Sussman was overbroad, because it encompassed documents created by him at the request of McCoy's attorney to assist the lawyer in preparing for litigation. These documents are protected from compulsory disclosure because they are the work product of the attorney. Therefore, we vacate the judgments holding McCoy and Sussman in contempt of court without prejudice to the issuance of subpoenas sufficiently specific in terms.

## I. *Facts*

McCoy was the sole proprietor and operator of a customshouse brokerage office. His business consisted of negotiating with offices of the United States Customs Service to determine the correct amount of duties owed on goods being imported into the United States by the firm's clients. McCoy's firm also collected money with which to pay these duties. While McCoy handled much of this business personally, one or more employees had managerial responsibilities.

Before McCoy terminated his business in 1975, representatives of the United States Customs Service attempted to inspect his records at the brokerage office in accordance with regulations requiring customshouse brokers to maintain records of their business and to allow access to them. 19 C.F.R. §§ 111.21 *et seq.* On advice of counsel, McCoy refused to permit the inspection. Shortly thereafter the business was terminated, and McCoy had the records stored in a number of locations; he alleges that their whereabouts are known only to him.

A grand jury later commenced investigation of McCoy's business activities, including alleged instances of double-billing clients, nonpayment of refunds owed to clients, other alleged violations of the mail fraud statute, 18 U.S.C. § 1341, and possible violations of the anti-racketeering statute, 18 U.S.C. § 1962(c). In 1978 McCoy was served with a *subpoena duces tecum* addressed to the "Authorized Custodian of Documents or Duly Authorized Representative Thereof Robert M. McCoy Customshouse Broker—Foreign Freight Forwarder 733 Lem Turner Road, Jacksonville, Florida" and requiring the production of numerous records and documents, including many personal records. After a hearing on a motion to quash the subpoena, at which numerous objections to the subpoena were urged, its scope was considerably narrowed; McCoy was nonetheless directed to produce the following materials for the period 1970 to 1977:

3. Any and all monthly, quarterly and annual (whether calendar or fiscal) financial statements and any and all work papers, schedules, memoranda, notes, or records used in the preparation of these financial statements.

4. Any and all brokerage account statements, which reflect the business' financial status or interest.

\* \* \*

9. Any and all of the following records and documents which are or were maintained by the business for the aforementioned time period.

 a. journals reflecting receipts and disbursements,

 b. ledgers, general and subsidiary,

 c. registers,

 d. charts of accounts,

 e. check request,

 f. payroll records, to include, but not be limited to the following: payroll registers, payroll sheets, payroll cards, time sheets,

 g. vouchers, bills, receipts, invoices and any other supporting documents related to all expenditures, reimbursements and billing procedures,

 h. contracts to which the business or its responsibilities are parties thereto,

 i. ship's files and voyage files,

 j. any and all computer or mechanical printouts of records which reflect the financial condition or activity of the business,

 k. Supplementary Customs Duty and Refund Ledgers,

 l. all Customs entries with all supporting documents required to be maintained by U.S. Customs Regulations, Section 111,

m. all correspondence, including envelopes and other papers maintained by the business,

n. all mailing records and receipts to include but not limited to certified, registered and insured mailings.

The district court denied McCoy's motion to quash the subpoena as narrowed, and it later granted the government's motion to compel production of the documents. When McCoy announced in open court that he would not produce the documents, the court, after a further hearing, adjudged him in contempt.

In 1975, while McCoy was involved in divorce proceedings, his attorney in those proceedings advised him that he might be subject to a criminal prosecution in connection with his receipt and disbursement of funds from his clients. McCoy and his divorce lawyer then consulted another attorney with experience in criminal matters about McCoy's criminal exposure. The latter attorney requested that the divorce attorney prepare analyses of McCoy's financial transactions. The divorce attorney engaged Sussman, an accountant, for that purpose. Sussman obtained documents from McCoy and McCoy's regular accountant and prepared the requested financial analyses.

In 1978 Sussman was served with a *subpoena duces tecum* directing him to produce "all books, papers, documents, records, and other things . . . [described below] relating to" McCoy, McCoy's brokerage office, and/or various relatives of McCoy. This subpoena was later narrowed by elimination of the reference to documents concerning McCoy's relatives; however, it continued to embrace, in part, the following records covering the period 1970 through 1977:

3. Any and all copies of financial statements, audit reports, certified audit reports, management reports and documents or records used in supporting these statements or reports for the aforementioned individual, entity or entities for the aforementioned time periods.

4. Any and all files, schedules, correspondence, memoranda, records or documents that pertain to the aforementioned individual, entity or entities for the aforementioned time periods.

\* \* \*

6. Any and all records, documents, journals, logs, time sheets or client ledger cards reflecting fees and charges including those reflecting amounts paid by the aforementioned individual, entity or entities, on behalf of the aforementioned individual, entity or entities, or to the aforementioned individual, entity or entities.

The district court refused Sussman's motion to quash the subpoena, granted the government's motion to compel production of the documents in question, and adjudged Sussman in contempt when he refused to produce the documents specified in the subpoena.

Both McCoy and Sussman were sentenced to be confined in jail for the 47 day remainder of the grand jury term, or until they would agree to comply with the subpoena, whichever would expire first. The district court withheld execution of the sentences of confinement pending the outcome of these appeals. The parties stipulated that, if the appellants' convictions were upheld, the sentence would be served during the term of the succeeding grand jury, which would carry on the investigation commenced by the grand jury that had subpoenaed the materials in question.

II. *Validity of McCoy's Conviction*

 Compelling production of an individual's books and papers to be used against him in legal proceedings violates both the fourth and fifth amendments. *Boyd v. United States,* 1886, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746. However, because the privilege against self-incrimination protects only individuals, records maintained by a corporation, a partnership or a collective group are not protected from compelled disclosure. *E.g., Bellis v. United States,* 1974, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678; *United States v. White,* 1944, 322 U.S. 69⁴ 64 S.Ct. 1248, 88 L.Ed. 1542 (collect'

group); *Wilson v. United States*, 1911, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (corporation). The records of a sole proprietorship are protected from disclosure as the records of an individual. *Shapiro v. United States*, 1948, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787; *In re Grand Jury Empanelled February 14, 1978*, 3 Cir. 1979, 597 F.2d 851, 859.

While natural persons need not produce their personal papers, their constitutional protection does not extend to "required records": " 'records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established.' " *Shapiro, supra*, 335 U.S. at 33, 68 S.Ct. at 1392, quoting *Davis v. United States*, 1946, 328 U.S. 582, 590, 66 S.Ct. 1256, 1260, 90 L.Ed. 1453. *See generally* 8 Wigmore, Evidence § 2259c at 363 & n. 6 (McNaughton rev. 1961). This limit on the constitutional exemption has been explained on the basis that the public interest in obtaining such information outweighs the private interest opposing disclosure, *see* 8 Wigmore, *Evidence* § 2259c at 367, and the further rationale that such records become tantamount to public records.

However, the doctrine does not lend itself to obliteration of the privilege against self-incrimination by allowing any record to be required of any person; an individual may invoke the privilege if the records required by law do not have "public aspects". *See Grosso v. United States*, 1968, 390 U.S. 62, 68, 88 S.Ct. 709, 713, 19 L.Ed.2d 906; *Spevack v. Klein*, 1967, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574. Moreover, if the record-keeping requirement is directed at a group inherently suspect of criminal activity, and a noncriminal and regulatory area of inquiry is patently not involved, the disclosure then has such a pervasive incriminatory effect that the

fifth amendment may be invoked. *Albertson v. Subversive Activities Control Board*, 1965, 382 U.S. 70, 86 S.Ct. 194, 15 L.Ed.2d 165.

Professor Wigmore has suggested that it makes no difference whether the record is required by the legislature or an agency. *See* 8 Wigmore, *Evidence* § 2259c at 366–67 and we agree with that view. No such distinction has been recognized by the cases,[1] and differentiating the two would not be consistent with the broad power Congress otherwise has been held empowered to confer on administrative agencies. Therefore, we conclude that the "required records" doctrine is not limited to records required to be kept by an Act of Congress, and includes records required by administrative regulations.

A *subpoena duces tecum* may not be "unreasonable and oppressive." Rule 45(b), F.R.C.P. It must also properly identify or describe the documents requested. *United States v. Morton Salt Co.*, 1950, 338 U.S. 632, 652, 70 S.Ct. 357, 369, 94 L.Ed. 401; *Oklahoma Press Publishing Co. v. Walling*, 1946, 327 U.S. 186, 209, 66 S.Ct. 494, 506, 90 L.Ed. 614. *See generally* 5A *Moore's Federal Practice* ¶ 45.05[2] at 45–45 & n. 43 (2d ed. 1977) and cases cited therein. This need not be with such particularity as to enable the witness to pick out a certain piece of paper and say, "Here it is." However, the request must be sufficiently definite to provide guidance as to what is to be produced by standards or criteria that make clear the duty of the person subpoenaed. *See* 5A *Moore's Federal Practice* ¶ 45.05[2] at 45–45 n. 43 (2d ed. 1977). The degree of particularity required depends, of course, on the nature, purpose and scope of the inquiry. *Oklahoma Press, supra*, 327 U.S. at 209, 66 S.Ct. at 506.

An order or a judgment of a court normally must be complied with promptly. If the order is believed to be

---

1. *Marshall v. Barlow's Inc.*, 1978, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305, is cited by McCoy, but this case is not helpful. It held that warrantless searches by the Occupational Safety and Health Review Commission pursuant to *statute* were unconstitutional. Administrative regulations requiring certain records to be maintained and open to inspection do not infringe on individual rights to the extent that warrantless searches would if allowed.

incorrect, the remedy generally is to seek a change in the order—usually by a motion to quash—and, if this is denied, then to appeal and, absent a stay, promptly to comply with the order. *Maness v. Meyers*, 1975, 419 U.S. 449, 458, 95 S.Ct. 584, 591, 42 L.Ed.2d 574. Absent a stay, if the person at whom the order or judgment is directed refuses to comply with the order, he risks being held in criminal contempt, even if the order is ultimately ruled invalid. *Ibid.*

However, in *Maness, supra,* the Court recognized that "[w]hen a court during trial orders a witness to reveal information . . . [c]ompliance could cause irreparable injury because appellate courts cannot always 'unring the bell' once the information has been released." 419 U.S. at 460, 95 S.Ct. at 592. The Court noted, therefore, that a person to whom such an order is directed may resist the order, and yet not be guilty of contempt if the order is declared invalid on appeal. *Ibid.* Although in *Maness, supra,* the Court referred to its consistent application of this rule in the context of orders made "during trial," the Court has previously applied the same standard to disobedience of orders rendered in connection with pre-trial proceedings. *See Gelbard v. United States,* 1972, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (witness ordered to testify before grand jury); *Malloy v. Hogan,* 1964, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (witness ordered to testify before referee investigating gambling and other criminal activities); *Silverthorne Lumber Co. v. United States,* 1920, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (company ordered to produce books and records to grand jury pursuant to subpoenas). We have previously recognized that the rationale of these cases suggests the following rule: if an order "requires an *irrevocable* and permanent surrender of a constitution-

al right, it cannot be enforced by the contempt power." *United States v. Dickinson,* 5 Cir. 1972, 465 F.2d 496, 512 (emphasis in original), *on remand,* M.D.La.1972, 349 F.Supp. 227, *aff'd,* 5 Cir. 1973, 476 F.2d 373, *cert. denied,* 414 U.S. 979, 94 S.Ct. 270, 38 L.Ed.2d 223.

▇▇▇ The *Maness* court did not limit its holding to orders that would require the surrender of constitutional rights, and while *Dickinson, supra,* held that this rule would apply to surrender of any constitutional right, the court did not preclude its application to the surrender of other rights. We hold the rule applicable to orders requiring the surrender of other rights or privileges, such as the attorney-client privilege and the attorney-work-product doctrine, where disclosure would cause irreparable injury and the rationale of *Maness, supra,* is equally compelling.[2]

Applying the foregoing principles, we first discuss whether the documents sought from McCoy are records that he was required by law to maintain for his business. Section 111.21 of Title 19, Code of Federal Regulations (1978), requires each customs-house broker to

> . . . keep current in a correct, orderly, and itemized manner records of account reflecting all his financial transactions as a broker. He shall keep and maintain on file a copy of each entry made by him with all supporting papers, except those documents he is required to file with Customs, and copies of all his correspondence and other papers relating to his Customs business.[3]

This provision has been in force, without change, since before 1971. The records it requires to be kept must be maintained within the customs district to which they relate for at least six years after the date of

---

**2.** The attorney-work-product doctrine is based on public policy, not constitutional grounds. *See United States v. Nobles,* 1975, 422 U.S. 225, 236, 95 S.Ct. 2160, 2169, 45 L.Ed.2d 141; *Hickman v. Taylor,* 1947, 329 U.S. 495, 510, 67 S.Ct. 385, 393, 91 L.Ed. 451.

**3.** "Books and papers" is defined as including:

> . . . all books, accounts, records, papers, documents, powers of attorney, data processing materials (other than cards, magnetic tapes and discs, and incidental intermediate forms temporary in nature), and correspondence of a broker relating to his Customs business.
>
> 19 C.F.R. § 111.1(e) (1978).

entry, 19 C.F.R. § 111.23(a), and must be made available for inspection by Customs field auditors or special agents. 19 C.F.R. §§ 111.25, 111.26.

■■■ The subpoena on its face seeks more than the "required records" described in Section 111.21; item number 3 demands, without qualification, *all* financial statements and related papers, and is not limited to customshouse brokerage records. The request patently includes McCoy's personal records, which are "private papers" sheltered by the privilege against self-incrimination. Items 4 and 9 refer to "the business" and might be presumed to relate only to McCoy's customshouse brokerage, but this is by no means clear and must be deduced from the fact that the subpoena on its face is directed to an unnamed "Authorized Custodian."

This address, on which the government heavily relies as narrowing all of the subpoena to required records, is of course some indication that the subpoena sought from the "Authorized Custodian" only the records of McCoy's business, not his personal documents. However, the apparent logic of the inference is undermined by the fact that the original subpoena undeniably included references to McCoy's personal financial records, thus making the address ambiguous.

■■■ McCoy properly asserted his claims by motion to quash the subpoena. Although he did not promptly appeal from the denial of his motion or seek a stay of the court's order compelling disclosure pending the outcome of an appeal, he was entitled to

resist the Court's order because his objections to the subpoena's breadth and lack of specificity were valid, and any complete response would have irrevocably [4] infringed his fifth amendment privilege against self-incrimination. The subpoena was invalid because, under the circumstances, the panoramic sweep of its command threatened infringement of McCoy's fifth amendment privilege and his fourth amendment or due process right [5] to disobey an order that required him (1) to do, at least in part, what he had a right to refuse, and (2) to determine at his own peril what he could or could not safely do. For these reasons, the court should have quashed the subpoena and permitted the prosecutor instead to issue one limited to required records of the customshouse business. Accordingly, we vacate the judgment of contempt, without prejudice to the issuance of a subpoena that complies with the requirements of this opinion.

McCoy contends that, even if the subpoena were limited to "required records," he would be privileged from producing the records because the mere act of producing them would be, in effect, "testimonial" (*i. e.,* he would implicitly be "authenticating" them as those records sought by the subpoena). While our decision vacating the contempt order makes it unnecessary to decide that question at this time, the issue has been argued, briefed by both parties, and it will doubtless be urged again should the subpoena be limited in accordance with this opinion and reissued. Therefore we deem it appropriate to avoid a further appeal by stating our views.

---

4. In *Maness, supra,* the Court rejected the assertion that the individual to whom an order to produce documents was directed would still be protected after disclosure because he could later move to suppress or object on fifth amendment grounds to introduction of the evidence. As the Court noted: "reliance upon a later objection or motion to suppress would 'let the cat out' with no assurance whatever of putting it back." 419 U.S. at 463, 95 S.Ct. at 593. The Court concluded that without something more, such as immunity, this protection was not adequate. *Id.* at 462 & n. 10, 95 S.Ct. at 593.

5. The fourth amendment right to be free from unreasonable searches and seizures was origi-

nally cited as the constitutional restriction on overboard *subpoenas duces tecum.* See, e.g., *Boyd v. United States, supra; Hale v. Henkel,* 1906, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652. However, the Court may be moving toward the position that the due process clause, not the Fourth Amendment, is the basis for such a restriction on *subpoenas duces tecum. See generally, In re Grand Jury Subpoena Served Upon Simon Horowitz,* 2 Cir. 1973, 482 F.2d 72, 75–79, *cert. denied,* 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86. We need not decide here the question whether the fourth amendment or the due process clause is the basis for this restriction.

In *Fisher v. United States,* 1976, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39, the Court considered a similar assertion. It recognized, as has Professor Wigmore, 8 Wigmore, *Evidence* § 2264 at 379–80, that the act of production could itself have communicative aspects: responding to the subpoena could be implicit acknowledgement of the existence of the documents and their possession or control by the taxpayer. 425 U.S. at 410, 96 S.Ct. at 1581. Furthermore, although it noted that "[i]t is doubtful that implicitly admitting the existence and possession of [papers prepared by another] rises to the level of testimony within the protection of the Fifth Amendment," 425 U.S. at 411, 96 S.Ct. at 1581, its approach suggests that production of one's own papers might be "testimony" protected by the Fifth Amendment. *See* 425 U.S. at 411–14, 96 S.Ct. at 1581–82; *see also In re Grand Jury Empanelled February 14, 1978,* 3 Cir. 1979, 597 F.2d 851, 861 n. 24.

However, these expressions in *Fisher* were not directed at the production of "required records." The proper designation by the government of certain records to be kept by an individual necessarily implies an obligation to produce them, and limited implied testimonial authentication. These obligations to keep and produce the records are in a sense consented to as a condition of being able to carry on the regulated activity involved. In this respect, the mere response by production is no more a violation of the privilege against self-incrimination than requiring the creation of the record itself, for it is the record, presumably, that might incriminate.[6]

---

**6.** McCoy also contends that the compelled production of the required records would be "testimonial" because many of them contain notations made by him. Should the records contain any such notations that McCoy considers privileged, he may, subject to such safeguards as the trial judge may prescribe, produce photographic copies of the full originals with McCoy's personal notations masked on the originals so they are not reproduced on the copies. The originals should not, of course, be mutilated but should be preserved intact so that, in case the privilege is questioned, the trial judge may determine any issues that arise.

---

### III. *Validity of Sussman's Conviction*

The attorney-work-product doctrine protects from disclosure materials prepared by an attorney acting for his client in anticipation of litigation. *Hickman v. Taylor,* 1947, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451. This doctrine is distinct from and broader than the attorney-client privilege, *United States v. Nobles,* 1975, 422 U.S. 225, 238 n. 11, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141; *Hickman v. Taylor, supra,* 329 U.S. at 508, 67 S.Ct. at 392; it protects materials prepared by the attorney, whether or not disclosed to the client, and it protects material prepared by agents for the attorney. *United States v. Nobles, supra,* 422 U.S. at 238–39, 95 S.Ct. at 2170 (investigator's report prepared for attorney in anticipation of litigation held protected work product).

It was merely a circumstance that Sussman, as an accountant, was employed to prepare financial analyses to assist the lawyer in assessing McCoy's potential criminal liability. The work was needed by McCoy's lawyer, and it might have been done by the lawyer himself or by an employee in his office if either had the necessary skill and time. The information sought was evidently material to McCoy's defense. Under these circumstances, the financial analyses prepared by Sussman were protected by the attorney-work-product doctrine.[7]

Of course, the work-product-privilege protects only the fruit of Sussman's labor. It does not shield documents turned over to

---

**7.** An attorney may not be used to insulate records an individual previously has prepared for his business. Thus, if an attorney instructs his client to deliver to the lawyer documents previously created by the client, those documents are not attorney work product, nor are they protected by the attorney-client privilege. *See, e.g., Fisher v. United States, supra,* 425 U.S. at 403–04, 96 S.Ct. at 1577. Because the records prepared by Sussman were not records that McCoy ordinarily kept for his brokerage firm, we need not consider whether a lawyer might create a work-product-privilege by instructing his client to maintain records that the client would otherwise keep in the normal course of business.

Sussman by McCoy that would have been subject to production if kept in McCoy's hands. The subpoena fails, however, to discriminate between these different types of documents. Paragraphs three, four and six of the Sussman subpoena could each be interpreted as including the financial analyses prepared by him. Paragraph three refers to "financial statements" and "audit reports"; paragraph four refers to schedules, records or documents pertaining to McCoy or his brokerage office; and paragraph six refers to records, documents, or journals reflecting amounts paid by or to McCoy or his brokerage office. These provisions do not limit the material sought to records Sussman received from McCoy. Thus, the subpoena is overbroad, and because compliance would have required Sussman irrevocably to surrender materials he was entitled to keep confidential, he is not properly subject to contempt for refusing to produce the documents requested.

For the foregoing reasons, the judgments of the district court are REVERSED.