**In re C.B.S., INC., Contempt of Court.**

**Misc. No. 860.**

United States District Court,
E.D. Louisiana.

Sept. 1, 1983.

Phillip Wittmann, Stone, Pigman, Walther, Wittmann & Hutchinson, Donald M. Richard, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for the prosecution.

Timothy B. Dyk, David Seidman, A. Douglas Melamed, Tillman L. Lay, Alan S. Tenenbaum, Wilmer, Cutler & Pickering, Washington, D.C., Jack M. Weiss, Brent B. Barriere and Patrick J. Fanning, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for C.B.S., Inc.

## OPINION

VERON, District Judge.

This matter arose from unfortunate events preceding the trial of seven New Orleans Police Officers (hereinafter the "McKenzie defendants") for their alleged misconduct regarding the investigation of the death of fellow officer Nupert in an Algiers, Louisiana housing project. The McKenzie defendants' alleged investigation tactics were well publicized in the New Orleans news media, and to a lesser degree, nationwide.

After a lengthy procedural history, the McKenzie defendants' trial was ultimately set for February 7, 1983, in Dallas, Texas, after a change of venue from New Orleans because of pretrial publicity there. On or about January 12 or 13, 1983, the McKenzie defendants' counsel became aware that Columbia Broadcast System, Inc. ("CBS") intended to broadcast a segment on their program "60 Minutes" concerning the "Algiers incident" on Sunday, January 16, 1983.

The broadcast was scheduled to follow a nationally-televised, National Football League play-off game (featuring the Dallas Cowboys no less). So, on January 14, 1983, the McKenzie defendants filed a Motion for a Silence Order in New Orleans to prevent the broadcast of what they felt would be prejudicial materials seriously jeopardizing their Sixth Amendment fair trial rights.

The New Orleans federal district judge (who was to hear the policemen's case in Dallas) immediately held a hearing in his New Orleans chambers concerning the Motion for a Silence Order. Attorneys for the McKenzie defendants and for CBS were present, and ultimately the trial judge requested that CBS produce a transcript of the subject "60 Minutes" so he could view *in camera* whether the material would prejudice the McKenzie defendants' fair trial interest.

At 11:30 A.M. that morning, CBS reluctantly agreed to produce such transcript by 2:00 P.M. In chambers that afternoon, one of the members of the local New Orleans law firm who originally stated that they represented CBS informed the judge that CBS' New York counsel's instructions were that they (the New Orleans firm) were not authorized to represent CBS. A short time later, another associate of the same New Orleans firm returned to chambers stating that the earlier denial of CBS' representation was a misunderstanding. After clarifying the representation issue, CBS refused to produce the transcript on First Amendment grounds.

The court, admittedly concerned by these events, and after further discussions, enjoined CBS from broadcasting the segment "anywhere in the United States." Furthermore, the court held CBS in criminal contempt of court for their vacillation on CBS' local representation in the case and concerning CBS' refusal to produce a transcript of the "Algiers" segment.

On interlocutory appeal, the Fifth Circuit held that the trial court's injunction was overbroad "geographically and temporally." After remand, the trial court ordered that the tape not be shown in the Dallas metro-

politan area on the subject Sunday. But again, CBS prevailed on appeal and ultimately the network did broadcast the controversial segment (with "teaser" advertising during the football game to stay tuned to view "the story that a federal judge tried to keep off the air.")

All Eastern District of Louisiana judges joined together in asking the U.S. Attorney to prosecute the criminal contempt. When the U.S. Attorney declined to do so, the Eastern District appointed two private attorneys to prosecute the matter pursuant to Federal Rule of Criminal Procedure 42.

■ The real crux of the matter here is whether the district court's production order, under the circumstances, was valid when viewed in the light of the media's First Amendment rights. A party may refuse to comply with an invalid order to produce information and raise the order's invalidity as a defense to contempt proceedings. *See, United States v. Ryan,* 402 U.S. 530, 91 S.Ct. 1580, 29 L.Ed.2d 85 (1971) and discussions *supra.* Although the production order's validity is before the Fifth Circuit presently, we feel it is necessary to also reach that question here.

We now find that CBS was not guilty of criminal contempt in refusing to comply with the district court's production order because:

1) The production order was invalid since it was an unconstitutional prior restraint on the media's First Amendment rights.

2) A party can refuse to comply with a production order, although they would risk contempt sanctions if the order was later held valid.

3) Criminal contempt citation was unnecessary here since the trial court's injunction against broadcasting the program already operated as a sanction for CBS' refusal to produce the segment's script.

## PRELIMINARY MATTERS

This matter has presented a myriad of controversial issues. Initially, the district court's jurisdiction and venue (for that matter) were questioned. In actuality, CBS was not served to appear in the subject hearing but rather the New Orleans law firm voluntarily appeared and advised the court that it represented CBS. Suffice it to say that CBS, through its local New Orleans representation, made a general appearance in the case to protect its interests and/or joined the hearing's proceedings as a witness. Even though the *McKenzie* case had already been transferred to Dallas, the New Orleans trial judge was (at the time) still designated to hear the case there. Thus, in the interest of judicial economy, the Federal Rules would allow a Motion for a Silence Order to be filed and heard where the trial judge was sitting.

It is also now clear that CBS' denial of local representation came as a result of an attempt to interpose a good faith defense to produce a transcript of the instant broadcast. After all, CBS had not been served in the matter and were merely seeking another avenue to assert a First Amendment claim. Their decision meant no disrespect for the trial court but was actually an attempt to prevent prior restraint of the broadcast. This is further supported by the fact that upon better reflection another New Orleans law associate was dispatched to the court immediately—to clarify CBS' position and to assure the court that the New Orleans firm did indeed represent CBS in the hearing.

## VALIDITY OF APPOINTING PRIVATE PROSECUTORS

■ Rule 42(b), concerning the "Disposition Upon Notice and Hearing" of criminal contempt, states in pertinent part:

The notice shall state . . . the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States Attorney *or of an attorney appointed by the court for that purpose,* by an order to show cause or an order of arrest . . . . (Emphasis added)

Clearly the appointment of private attorneys to prosecute criminal contempts is proper. *See, e.g., Musidor, B.V. v. Great American Screen,* 658 F.2d 60 (2d Cir.), *cert. denied* 455 U.S. 944, 102 S.Ct. 1440, 71 L.Ed.2d 656 (1981); *Frank v. United States,* 384 F.2d 276 (10th Cir.1967), *aff'd. on other grounds,* 395 U.S. 147, 89 S.Ct. 1503, 23 L.Ed.2d 162 (1969) and *In Re: United Corp.* 166 F.Supp. 343 (D.Dela.1958). This is so for a number of reasons. The U.S. Attorneys' Office in the district may have policies preventing it from prosecuting criminal contempts, it may not have the time or manpower to do so, or it may have such a stake in a particular case that their judgment could not remain impartial. Our ruling here, nonetheless, does not prevent a party from contesting the appointment of a particular private attorney in certain circumstances. Rather, we merely feel that the appointment of private attorneys in the instant case was proper.

## THE PRODUCTION ORDER'S INVALIDITY

■ The only stated purpose for the court's production order was to aid the court in deciding whether to enjoin the scheduled broadcast.[1] The court did characterize the possibility that a pretrial broadcast would prevent it from impaneling a fair jury in Dallas as a "slight chance," and said it was "very unlikely" that it would issue a restraining order. So, the court issued the production order after balancing First and Sixth Amendment rights, apparently believing that neither prepublication review nor any injunction order raised serious First Amendment questions.

CBS, of course, argues that the production order was an impermissible attempt at editing the segment's content, and that it was unconstitutional as a form of prior restraint or censorship over First-Amendment-protected materials. Since *Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), the Supreme Court has unwaiveringly held that a system of prior restraint is repugnant to the First Amendment. *See, e.g., Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) and *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971). And, in *Nebraska Press Association v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 2802, 49 L.Ed.2d 683 (1976), the Court, noting that prior restraint of publication is "the most serious and the least tolerable infringement on First Amendment rights," struck down a restraining order designed to protect Sixth Amendment fair trial rights, making clear that such orders are rarely, if ever, permissible.

In any event, one particular case provides a solid ground for our ruling rejecting the production order's validity. In *Goldblum v. National Broadcasting Corp.,* 584 F.2d 904 (9th Cir.1978), a case strikingly analogous to the instant matter, the plaintiff sought to enjoin the National Broadcasting Corporation ("NBC") from broadcasting a well-publicized film based on the Equity Funding Corporation scandal. The moving party was the former president of Equity Funding who was in jail awaiting a parole decision and was still a defendant in a civil suit involving the scandal. Plaintiff Goldblum had alleged that the presentation would be an inaccurate and false portrayal of the Equity Funding incident and his participation in it.

Based on Goldblum's complaint, then, the California federal district judge ordered

---

**1.** It is clear that the McKenzie defendants did not adequately support their Motion for a Silence Order, otherwise the trial judge's proposed examination of the 60 Minutes transcript—as a discovery device—would have been unnecessary. The McKenzie defendants, even considering the shortness of time involved between learning about the broadcast and its proposed showing date, could have obtained affidavits from the various New Orleans interviewees for the segment and/or could have obtained the same police records CBS had gathered months before—so as to better argue their trial—prejudice claims. It was the absence of supporting reasoning which, it seems, heightened the court's reservations over the potential broadcast and whether it would contain (among other things) a reenactment of the policemen's alleged investigatory conduct after Officer Nupert's slaying.

NBC to produce the motion picture in order to view it for "inaccuracies." NBC after originally agreeing to produce, then declined to furnish the film and the judge ordered counsel for NBC imprisoned until he submitted the film to the court. NBC then sought relief from the Ninth Circuit and that court held the production order invalid under *Nebraska Press Association* and other decisions concerning prohibited interference with the editorial process. The *Goldblum* court held:

> The express and sole purpose of the district court's order to submit the film for viewing by the court was to determine whether or not to issue an injunction suspending its broadcast. Necessarily, any such injunction would be a sweeping prior restraint of speech and, therefore, presumptively unconstitutional.... We find no authority which is even a remote justification for issuance of a prior restraint on a theory that parole officials would somehow become inflamed by the contents of a communication or on a theory that a wholly speculative criminal prosecution might commence at some future date.... The order not only created a reasonable apprehension of an impending prior restraint, it was also a threatened interference with the editorial process.... The district court proceedings here intervened in the editorial process by ordering an official of the broadcasting company to produce a film just before its scheduled broadcast so that it could be examined for inaccuracies. A procedure thus aimed toward prepublication censorship is an inherent threat to expression, one that chills speech.

> A broadcaster or publisher should not ... be required to make a sudden appearance in court and then to take urgent measures to secure appellate relief, all the while weighing the delicate question of whether or not refusal to comply with an apparently invalid order constitutes a contempt .... (citations omitted)

584 F.2d at 906–907.

We are faced with the *Goldblum* situation here. The trial judge issued the production order out of legitimate concern whether any of the 60 Minutes material would prejudice the McKenzie defendants' right to a fair trial. However, since the judge wished to act as a reviewing "editor" regarding the tape, *Goldblum* clearly states that such interference with the media's First Amendment rights is prohibited. And furthermore, *Goldblum* would sanction CBS' firm stand at the January 14, 1983 hearing so that CBS would not have to juggle contempt fears with the time pressures of an interlocutory appeal. We hold the instant production order invalid.

*Nebraska Press Association, supra,* moreover, provides another basis for holding the instant production invalid. Its teaching has laid down an inquiry for determining whether less restrictive alternative approaches exist vis à vis a prior restraint of First Amendment rights. Even if prior restraints to protect fair trial rights were permissible in some limited class of cases, the production order here is invalid since the district court failed to consider whether that order was essential or whether alternative grounds existed for disposing of the McKenzie defendants' motion. *Nebraska Press Association, supra,* 427 U.S. at 562–569, 96 S.Ct. at 2804–2807, detailed three inquiries as to whether a prior restraint would become necessary: (1) the nature and extent of pretrial news coverage, (2) whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; and (3) how effectively a restraining order would operate to prevent the threatened danger.

When the January 14, 1983 record is examined in light of the *Nebraska Press Association* standards, it is clear that other, more suitable alternatives existed. As to the nature and extent of pretrial news coverage, the trial court must rely on facts demonstrating that beyond doubt, "further publicity, unchecked, would so distort the views of potential jurors that 12 could not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court." *Nebraska Press*

*Association, supra* at 569, 96 S.Ct. at 2807. The record failed to show that defendants' case had generated any significant publicity at all in the Dallas area. Thus, the 60 Minutes broadcast could hardly cause publicity to become "intense" or "pervasive." CBS offered an uncontroverted affidavit indicating that an average of 17% of the 3.6 million Dallas residents generally watched 60 Minutes—which conversely, means that routinely 3 million Dallas people do not. Even given the presumably larger viewing segment for the Dallas-Green Bay football playoff game aired prior to the subject 60 Minutes telecast, this court has no doubt that 12 impartial jurors could be found from the remaining "large" Dallas juror-qualifying population who would not have viewed the football game or CBS' "Algiers" segment. Moreover, even a venireman having viewed the subject telecast could still be found impartial through proper voir dire examination.

As for alternative measures to mitigate the effects of pretrial publicity, a trial court must consider that many possible alternative measures exist and that such measures, properly used, have never yet proved inadequate in safeguarding Sixth Amendment rights. *Id.* at 569, 96 S.Ct. at 2807. Such measures might include (a) effective use of voir dire (b) continuing the trial until the "publicity's effects" have subsided (c) change of venue (d) curative jury instructions admonishing jurors to decide the case based on evidence received only in open court. *Id.* at 563–564, 96 S.Ct. at 2804–2805.

The trial judge addressed only change of venue and continuance during the subject hearing. A further change of venue was viewed impractical and a further continuance motion was rejected since "the case was already over two years old." However, Federal Rules of Criminal Procedure 21 does not preclude a second change of venue, and 18 U.S.C. § 3161(h)(8) certainly does not preclude multiple continuances. And, in any event, voir dire examination has been found an adequate cure for publicity far more "pervasive and intense" than in the present matter. *See United States v.*

*Haldeman,* 559 F.2d 31 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), and *In re: National Broadcasting Co.,* 635 F.2d 945 (2d Cir. 1980).

In considering the efficacy of the restraining order, a prior restraint is justifiable only if it realistically will prevent potential jurors from receiving information about the defendant's criminal case. Here, only CBS was to be bound by the district court's order—which would certainly prevent information dissemination from the 60 Minutes show but *not* from other forms of the news media. The information collected for the "Algiers" segment was also available to the Dallas media and thus any outright prejudicial effect to the McKenzie defendants would not be stopped by the production order or any subsequent restraint.

Summarizing the *Nebraska Press Association* alternatives to prepublication censorship, it is clear that any prior restraint on CBS would have been unconstitutional. The district court could have made this determination without reviewing the segment's script.

Even beyond the *Goldblum* ruling and *Nebraska Press Association's* bases for the instant production orders invalidity, yet another ground for our decision exists. When CBS ultimately declined to comply with the trial judges' production order, the court plainly viewed the immediate imposition of a restraining order as a sanction for CBS' failure to comply with the order. Having already suffered this sanction of a restraining order, which remained in effect until the Fifth Circuit stayed and modified it, CBS should not be forced to run the gauntlet a second time or suffer double penalties. *See Abney v. United States,* 431 U.S. 651, 662, 97 S.Ct. 2034, 2041, 52 L.Ed.2d 651 (1977). Theoretically then, CBS is not subject to criminal contempt proceedings regardless of the disposition of First Amendment issues.

## THE VIOLATION OF A PRODUCTION ORDER

Reading from the transcript of the subject informal hearing in the judge's cham-

bers on January 14, 1983, it is clear that the Judge "encouraged" CBS' New Orleans attorneys to agree to comply with the production order. CBS did no more than indicate that it was prepared to comply with the District Court's order. CBS had repeatedly objected to turning over a transcript of the 60 Minutes segment, stating that "it is our position [that] we do not want to reveal any contents" and that CBS did not "want to agree to" produce the script.[2] And, even after the production order, CBS' counsel continued to object to production of the script, stating "our feeling is that it would be a form of censorship ... [and] a violation of our constitutional rights." The judge himself recognized but rejected "CBS' stand" that it could not properly be required to produce the script.

Although CBS continually objected to the order, it did, as the trial judge found, "advis[e] the court ... that it was prepared to comply with the court's order." But, such a statement reviewed next to CBS' repeated objections indicates merely a deference to the district court's instruction and does not constitute a waiver of CBS' right to challenge the validity of the order.

■ It is well settled that a party may waive his right to challenge a trial court order on appeal only by express and unambiguous statements of an intention to do so. *See, e.g. Payne v. SS TROPIC BREEZE,* 423 F.2d 236, 238 (1st Cir.), *cert. denied,* 400 U.S. 964, 91 S.Ct. 363, 27 L.Ed.2d 383 (1970). A waiver of First Amendment rights, especially, will be found only on the basis of clear and compelling evidence that the party understood his rights and intentionally relinquished or abandoned them. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 143–45, 87 S.Ct. 1975, 1985–86, 18 L.Ed.2d 1094 (1967). *Curtis Publishing Co., supra,* expressly adopted the "knowing waiver" standard of *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) in finding that a publisher's failure to interpose a First Amendment defense did not waive the

defense. That court found that where First Amendment freedoms are involved, "we are unwilling to find waiver in circumstances which fall short of being clear and compelling." *Curtis Publishing Co., supra,* 388 U.S. at 145, 87 S.Ct. at 1986. As CBS has argued, even where First Amendment rights are not involved, actions to *comply* with a court order (as opposed to consent to the *entry* of the order) do not constitute a waiver of the right to challenge the order on appeal. *See* 15 C. WRIGHT & A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3902, at 409 n. 26 (1976).

■ In *United States v. Ryan, supra,* the Supreme Court held that a party may refuse to comply with an invalid order to produce information and raise the order's invalidity as a defense to contempt proceedings. This is so because such production orders, unlike injunctions, are not immediately appealable. *Accord, Maness v. Meyers,* 419 U.S. 449, 460, 95 S.Ct. 584, 592, 42 L.Ed.2d 574 (1975); *In re: Grand Jury Proceedings,* 601 F.2d 162 (5th Cir.1979).

Non-appealable production orders are thus very different from ordinary injunctions which must be obeyed even if unconstitutional. *Walker v. City of Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967). In *Maness v. Meyers, supra,* the court explained why orders to disclose information which are not appealable are not governed by the *Walker* rule:

> [In some instances] [c]ompliance could cause irreparable injury because appellate courts cannot always "unring the bell" once the information has been released. Subsequent appellate vindication does not necessarily have its ordinary consequence of totally repairing the error. In those situations we have indicated the person to whom such an order is directed has an alternative [resistance to that order with the concomitant possibility of an adjudication of contempt] ....

2. It was CBS' refusal to produce the script that led the court to order its production in the first place.

419 U.S. at 460, 95 S.Ct. at 592. *Maness* involved a resistance based on Fifth Amendment grounds while CBS' resistance here was based on a good-faith, First Amendment basis. And, the Fifth Circuit has recognized that a person subject to an order to reveal information "may resist the order, and yet not be guilty of contempt if the order is declared invalid on appeal." *In re: Grand Jury Proceedings, supra* at 169.

The appointed prosecutors, however, argue that "[t]here is no threat of irreparable injury when a district court judge views *in camera* the script of a television program." The short answer to this is that even allowing a judge's review is a form of prior restraint or censorship since it would allow, as here, the judge to become an "editor" of First Amendment materials for the reasons just discussed. Although we feel the *Ryan/Maness* rule *does not* require a showing of irreparable injury as a prerequisite to non-compliance, CBS' compliance with the instant order would have inherently involved a surrender of constitutional guarantees and irreparable injury. As the Supreme Court has said, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes' irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (plurality opinion).

Therefore, since CBS had a good faith basis for believing the production order to be invalid and since CBS had little or no time to seek writs to appeal the trial judge's forceful mandate, CBS was justified in refusing to comply with the order under the *Ryan/Maness* line of cases. The court further finds that CBS' temporary denial of local representation did not rise to a contemptuous level.

Accordingly, the Special Prosecutor's Rule to Show Cause why CBS, Inc. should not be held in criminal contempt of court is DISMISSED.