**IN RE: CHIQUITA BRANDS INTER- NATIONAL, INC. ALIEN TORT STATUTE AND SHAREHOLDER DERIVATIVE LITIGATION**

**This Document Relates to:**

ATS Actions: 07–60821–CIV–Marra, 08– 80421–CIV–Marra, 08–80465–CIV– Marra, 08–80508–CIV–Marra, 08– 84080–CIV–Marra, 10–60573–CIV– Marra, 10–80652–CIV–Marra, 11– 80404–CIV–Marra, 11–80405–CIV– Marra.

ATA Actions: 08–20641–CIV–Marra, 09–80683–CIV–Marra, 11– 80402–CIV–Marra

**CASE NO. 08–MD–01916–KAM**

United States District Court, S.D. Florida.

Signed 09/06/2017

## ORDER OVERRULING DEFENDANT CHIQUITA'S ASSERTION OF PRIVILEGE OVER DOCUMENTS PREVIOUSLY PRODUCED TO THE U.S. DEPARTMENT OF JUSTICE (ATS ACTIONS) and GRANTING PLAINTIFFS' MOTION TO COMPEL PRODUCTION OF VALVERDE AND OLIVO MEMORANDA (ATA ACTIONS)

KENNETH A. MARRA, United States District Judge

**THIS CAUSE** is before the Court on the Defendant Chiquita Brand International, Inc. ("Chiquita")'s assertion of privilege over certain documents. The documents in question were previously produced by it to the United States Department of Justice ("DOJ") during criminal plea negotiations culminating with Chiquita's entry of a guilty plea on the charge of engaging in transactions with a foreign terrorist organization, in violation of 50 U.S.C. § 1705(b) and 31 C.F.R. 594.204, in March, 2007 in the United States District Court for the District of Colombia. The issue presented is whether Chiquita waived any potentially applicable attorney-client and work-product privilege claims, as to third-party civil litigants, by releasing the materials to a federal agency in the course of the agency's investigation of Chiquita.

In the Alien Tort Statute ("ATS") Cases, the issue was first framed in the Court's Global Scheduling Order [DE 1361], which directed initial document disclosures under Rule 26(a)(1), to include Defendant Chiquita's production of "all documents previously produced by the Defendant to the Department of Justice (DOJ), the Securities Exchange Commission (SEC) and the plaintiffs in the ATA["Anti–Terrorism Act"] Actions [DE 1361, Section I (4) (a) ]. To the extent Chiquita sought to withhold any documents previously produced under claim of privilege, the Order directed the Chiquita to file a statement of cause as to why any privilege potentially attaching to the contents of any document was not been waived by virtue of Chiquita's prior production of the material to the government. *Id.*

In its response to the Court's show cause order, Chiquita asks the Court to determine whether its production of documents to the DOJ was coerced or "involuntary," so as to render any purported waiver invalid and leave all privileges intact [DE 1411]. In Reply, Plaintiffs contend that Chiquita made a strategic, self-interested decision to cooperate with the DOJ by voluntarily producing all requested documents in the hope of improving its bargaining position with the government, effectively waiving any applicable privileges to the communications [DE 1423].[1]

In the ATA Cases, Plaintiffs similarly requested production of "[a]ll documents that Chiquita or its affiliates provided to, or discussed with, the U.S. Department of Justice (DOJ) in connection with the DOJ investigation of Chiquita that resulted in Chiquita's March 19, 2007 guilty plea" [DE 1480–1, ¶¶ 3, 4]. Chiquita objected to the extent the request encompassed work product or attorney-client privileged matters in documents generated after February 2003, contending that the "coerced production" of such documents to the DOJ

---

1. Plaintiffs contend that Chiquita was successful in achieving leniency: While the Government originally proposed requiring Chiquita to plead guilty to both 18 U.S.C. § 2339B (providing material support to a designated foreign terrorist organization) and 18 U.S.C. § 1705 (a lesser offense of engaging in transactions with a designated terrorist organization), and to pay a $79 million fine, ultimately Chiquita pled guilty to the lesser offense only and paid a $25 million fine [DE 1423 p. 5].

during its 2003–2007 investigation did not constitute a waiver of applicable privileges [DE 1480–1, ¶ 5].

The ATA Plaintiffs now move to compel the production of two specific documents subsumed within Chiquita's prior DOJ document production—the Valverde and Olivo memoranda—on the theory that any privilege was waived at the time of production to the DOJ. The ATA Plaintiffs further argue that Chiquita previously produced these documents in the course of routine discovery exchanges in this proceeding, and that its subsequent, belated effort to "claw back" the documents under claim of a good faith, inadvertent release of the documents is ineffective to override the waiver achieved through its original production. In briefing upon this motion [1471, 1480, 1489], the parties reiterate the legal arguments previously made on the general waiver issue attending Chiquita's DOJ production, while adding multiple sub-arguments relating to the alleged inadvertent release of the documents.

For the reasons discussed below, the Court concludes that Chiquita made a voluntary production of the documents to the DOJ in the course of its prior plea negotiations with that agency, resulting in an effective waiver of any applicable privileges. The Court shall therefore direct full production of the documents in controversy. The Court also grants the ATA Plaintiffs' motion to compel production of the Valverde and Olivo memoranda on this same ground, obviating the need to address the alternative arguments raised as a basis for a compelled production of these specific memoranda.

## Background

In early 2003, shortly after the U.S. government formally designated the Autodefensas Unidas de Columbia ("AUC") as a foreign terrorist organization ("FTO"), Chiquita disclosed the history of its financial relationship with the AUC to federal authorities. The DOJ then began investigating Chiquita's business practices in Colombia. According to Chiquita, this involved requests for Chiquita's cooperation, including the voluntary production of a large volume of documents.[2]

Chiquita contends that it cooperated fully with the DOJ from the outset of its investigation, making an initial voluntary production of documents in December, 2003 and a second in January, 2004. The second production, made under cover of letter dated January 20, 2004, recites that the production is made "in response to [the DOJ's] requests for information from Chiquita Brands International" and references a privilege log identifying withheld documents from the first two productions to be forwarded under separate cover. This letter concludes, "As you know [Chiquita] is seeking ways to provide the information sought by the Department through non-privileged communications—such as making fact witnesses available for interview. Notwithstanding the desire to protect privileged information in potential civil litigation, Chiquita is committed to assuring the government receives all information required by your inquiry" [DE 1411, Ex. 1].

Chiquita claims that these initial responses did not satisfy the DOJ—leading Chiquita to make a third production on

2. Notably, Chiquita has not filed any of the early correspondence authored by DOJ relating to its request for cooperation and production of documents in support of its current briefing on privilege; instead, it has filed a single piece of DOJ correspondence dated October 6, 2005, generated at the tail end of Chiquita's exchanges between the DOJ on the

subject [DE 1411 Ex. 6]. Without the benefit of seeing the precise text of the earlier DOJ communications referenced by Chiquita, it is impossible for Court to know exactly what the DOJ asked for, under what authority it issued its requests, and what enforcement actions, if any, it threatened in the event of Chiquita's non-cooperation.

January 28, 2004, under cover of letter captioned "Third Voluntary Production" [DE 1411, Ex. 2]. In this letter, Chiquita states that it is "voluntarily providing otherwise privileged information as part of its commitment to cooperate fully with the Department's inquiry," and reiterates that it is supplying "the attorney-client privileged and/or work product doctrine protected documents you requested" under guidelines set forth in prior correspondence between the parties, which it again reiterated:

> [W]e understand that the Department will not use the documents, and/or the information discussed in this letter to assert a subject matter waiver of other privileged materials and information that are not provided to the Department, or to assert a waiver of any privileged materials for the benefit of any third parties.

[DE 1411, Ex. 2]. On April 5, 2004, Chiquita supplied the DOJ with a fourth "Production of Documents and Materials" self-described as part of its "continuing commitment to cooperate with the Department of Justice" which again referenced the "limited non-waiver" agreement governing the production [DE 1411, Ex. 3]. Under cover of letter dated October 28, 2004, Chiquita made a further production, again subject to the parties' "limited non-subject matter waiver." [DE 1411, Ex. 4]

According to Chiquita, on September 8, 2005, it received a notice of representation from Assistant United States Attorney ("AUSA") Jonathan Malis, together with a grand jury subpoena seeking production of certain documents previously withheld from Chiquita's document productions. On September 28, 2005, Chiquita responded, expressing chagrin at the DOJ's request for yet more documents, including those listed on Chiquita's previously supplied privilege log, and a concern as to whether this additional request for documents would be governed by the "limited non-

subject matter agreement" previously established. Chiquita also expressed concern that "any reservation in [its] response to these requests" would be taken into consideration by the government, and therefore might "jeopardize Chiquita's hard earned cooperator status."

Further, Chiquita requested more time to formulate a response to the government's latest request, in light of the government's recently "stated position that it will not discuss what types or categories of privileged information it is seeking, or acknowledge any categories of material it is not seeking," and its further request that Chiquita "state specific objections and grounds for any possible category of material requested that the Company may wish to continue to withhold based on assertion of privilege or work-product" [DE 1411, Ex 5, p. 7].

By letter dated October 6, 2005, AUSA Malis responded in material part:

> The bulk of your letter concerns Requests 1 and 2 of the Subpoena. These requests call for the production of documents listed on Chiquita's privilege log dated April 5, 2004 ("Privilege Log") that Chiquita has withheld in whole or in part based on assertions of attorney-client or work product privileges. The requested documents represent over 100 entries in the Privilege Log, all but eight of which Chiquita has withheld entirely.
>
> . . . .
>
> Based on your September 28th letter, it seems there may be some misunderstanding as to the basis under which the government expects Chiquita to comply with Requests 1 and 2. In fact, the government has not asserted that Chiquita has waived its right to claim privileges as to any unproduced documents within the subject matter of the investigation based on its prior productions. *Rather, we expect Chiquita to comply with Re-*

*quests 1 and 2, based on Chiquita's repeated assertions that it wants to cooperate fully in the ongoing investigation.*

Your September 28th letter claims that Chiquita has won hard earned "cooperator status." Although the Department of Justice has never conferred "cooperator status" on Chiquita, its level of cooperation will be evaluated fully by the Department in reviewing this matter. This level will be gauged, in part, by Chiquita's willingness to waive attorney-client and work product privilege as to its factual review and contemporaneous legal advice concerning the (AUC) payments. To be clear, it is these materials that we seek. Indeed, these were the materials promised by your letters of January 27 & 28, 2004, but never fully provided.

. . . . .

Chiquita's refusal to waive privilege as to the advice it received from counsel during the period February 2003 through January 2004 has frustrated this investigation. Because the payments continued until January 2004, it is our view that many of the documents on the Privilege Log reflect "contemporaneous legal advice" or contain facts relevant to Chiquita's decision to continue making the payments. To the extent that the Subpoena calls for the production of privileged material that does not consti-

tute in whole or part such materials, please notify us.
[DE 1411 Ex. 6] [emphasis added].

Chiquita apparently did not take such a position, and under cover of letter October 14, 2005 [DE 1411 Ex. 7], instead simply agreed to a full production of the requested documents. Chiquita contends that it ultimately "capitulated" to the DOJ's demand for privileged materials "out of fear of being labeled as uncooperative" at a time the DOJ was assessing its cooperation level for charging purposes. Chiquita further contends that its "capitulation" to the DOJ's demand for privileged materials was made under operation of the "The Thompson Memorandum,"[3] a then-existing policy of the U.S. Attorney's Office which required all federal prosecutors to factor a "corporation's timely and voluntary disclosure of wrongdoing and its willingness to cooperate in the investigation of its agents, including, if necessary, the waiver of corporate attorney-client and work product protection," in all charging decisions.[4] [Chiquita Show Cause Statement, DE 1411, p. 3 n.1]

Claiming it faced an "existential" threat of indictment by reason of the government's then adherence to the policy, Chiquita contends it wrestled with the "Hobson's choice" of waiving the privilege or "fac[ing] the wrath of the government and a public indictment" by withholding the documents [DE 1411, p. 4], rendering its ultimate decision to cooperate with the

---

**3.** July 2004, the DOJ allegedly asked Chiquita to prepare a "Thompson Memorandum" position paper outlining the reasons it believed the government should not prosecute Chiquita. Chiquita indicates that it supplied the requested paper in October, 2004, and at request of DOJ, filed a supplemental paper further elaborating on the advice of counsel issue.

**4.** Memorandum from Larry D. Thompson, Deputy Attorney General, Dept. of Justice, to

Heads of Dept. Components, U.S. Attorneys, *Principles of Federal Prosecution of Business Organizations* (January 20, 2003). According to Chiquita, in August 2008, the government revised its corporate charging guidelines to restrict the circumstances under which the government might request privileged communications, and to allow credit for cooperation in the absence of express privilege waivers. Chiquita Response to Show Cause Order [DE 1411, p. 12 n. 14].

Government and produce the documents "involuntary" or "coerced." Accordingly, it claims that any purported "waiver" of privileges in its dealings with the DOJ was not valid, and cannot now be enforced in the context of this third-party civil litigation.

## Analysis

■ The attorney-client privilege is designed "to encourage full and frank communication between attorneys and their clients, and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). The privilege serves the clients need for legal advice, but it also serves the attorney's need to receive complete information in order to give the proper advice. *Id* at 390, 101 S.Ct. 677.

■ A key element of the privilege is whether the communications is made in confidence, or under circumstances from which it may reasonably be assumed that the communication will remain in confidence. Thus, the privilege is lost if there is a disclosure inconsistent with maintaining the confidential nature the attorney-client relationship, such as the release of otherwise privileged communication to a third party. *United States v. Jones*, 696 F.2d 1069 (4th Cir. 1982); *Hernandez v. Tannien*, 604 F.3d 1095, 1100 (9th Cir. 2010).

■ However, an involuntary disclosure will not automatically waive the privilege. *United States v. de la Jara*, 973 F.2d 746, 749 (9th Cir. 1992). For example, a distinction is drawn between a purely voluntary disclosure of documents to a government investigatory agency, and disclosure by subpoena, with the latter generally "lack[ing] the self-interest which motivates the former." *In Re Subpoenas Duces Tecum*, 738 F.2d 1367, 1373 (D.C. Cir. 1984). However, the mere existence of a subpoena or perceived risk of prosecution in the event of noncompliance with a subpoena is not enough to show involuntary action.

"[W]ithout the threat of contempt, the mere existence of a subpoena does not render testimony or the production of documents involuntary." *See In re Pacific Pictures*, 679 F.3d 1121, 1130 (9th Cir. 2012) (citing *Westinghouse Corp. v. Republic of the Philippines*, 951 F.2d 1414 (3d Cir. 1991)).

■ The work product doctrine is distinct from and broader than attorney-client privilege; this doctrine protects materials prepared by an attorney, whether disclosed to the client or not, as well as materials prepared by agents for the attorney. *In re Grand Jury Proceedings*, 601 F.2d 162, 171 (5th Cir. 1979). It shelters the mental processes of the attorney, providing a privileged area within which the attorney can analyze and prepare the client's case. *United States v. Nobles*, 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). The protection provided by the work-product doctrine is not absolute, and may be waived. *Id.* at 239, 95 S.Ct. 2160. Generally, work-product protection is waived when protected materials are voluntarily disclosed in a manner which is either inconsistent with maintaining secrecy against opponents or which "substantially increases the opportunity for potential adversaries to obtain the information." *In re Grand Jury Subpoenas*, 561 F.Supp. 1247, 1257 (E.D.N.Y. 1982).

■ In this case, Chiquita asserts that it was coerced into waiving attorney-client and work-product privileges in its dealings with the DOJ by an implicit threat of a more vigorous criminal prosecution if it did not comply with the DOJ's unconditional demands for production of all attorney-client communications touching the subject of its financial support of the AUC. Chiquita contends that the government's coercion occurred through operation of the Thompson Memorandum, and the government's conditioning of a grant of "cooperator sta-

tus" on Chiquita's express willingness to waive the attorney-client and work-product privileges. Against this backdrop, it contends that its waiver before the DOJ cannot be deemed voluntary, and, because it was involuntary, the waiver was also invalid.

The Court rejects Chiquita's "coerced" production theory as unsupported. From the limited record evidence of relevant DOJ–Chiquita correspondence which Chiquita has elected to present, it appears that the DOJ was simply responding to earlier representations and promises made by Chiquita regarding production of contemporaneous attorney-client communications on the subject of AUC payments up to the date of the last payment (February 2004) when it continued to press for full production of contemporaneous attorney-client communications.

There is no suggestion that the DOJ demanded that Chiquita waive the attorney-client or work product privileges as a precondition to receiving favorable consideration or leniency from the government in its charging decision. Nor is there any suggestion that the DOJ referenced the Thompson memorandum as a basis for the demand of privileged documents, or that it used the threat of contempt to induce Chiquita's compliance with the grand jury subpoena. It appears, instead, that the DOJ simply called on Chiquita to honor its original promise to cooperate with the government, and, in that process, sought the production of documents which Chiquita itself had offered to provide in a spirit of compete transparency.

Under these circumstances, the Court does not view Chiquita's production of the attorney-client communications or other documents produced to the DOJ as "compelled" or "involuntary." *See Westinghouse Electric Corp. v. Republic of the Philippines,* 951 F.2d 1414 (3d Cir. 1991) (companies' voluntary disclosure of documents to

the SEC and DOJ, after initially objecting to subpoena and moving to quash it, waived attorney client privilege and work product doctrine as against all other adversaries); *United States v. Mass. Institute of Technology,* 129 F.3d 681, 686 (1st Cir. 1997) (party's disclosures to a law enforcement authority are considered voluntary even if "practical pressures and the legal constraints" upon that party forced the disclosures); *In re Western States Wholesale Natural Gas Antitrust Litigation,* 2016 WL 3965185 (D. Nev. 2016); *United States v. Balsiger,* 2010 WL 3239327 (E.D. Wis. 2010). *See also Jane Doe No. 1 v. United States,* 749 F.3d 999 (11th Cir. 2014) (waiver of work product privilege claim over correspondence voluntarily sent, without subpoena, to the U.S. Attorneys' office during criminal plea negotiations).

■ While it may have been in Chiquita's self-interest to comply with the DOJ's request for the documents, to extent that a failure to cooperate could have adversely affected its opportunity to gain more lenient treatment in plea negotiations, an action motivated by self-interest does not equate with involuntary action. Simply put, a party may not voluntarily waive the attorney-client or work product privileges for its own benefit in dealings with a third-party government agency, then hide behind the privilege in subsequent civil litigation. To hold otherwise would produce unfair, as well as impractical, results. As stated by the First Circuit in *United States v. Massachusetts Institute of Technology, supra:*

> Anyone who chooses to disclose a privileged document to a third party, or does so pursuant to a prior agreement or understanding, has an incentive to do so, whether for gain or to avoid disadvantage. It would be perfectly possible to carve out some of those disclosures and

say that, although the disclosure itself is not necessary to foster attorney-client communications, neither does it forfeit the privilege. With rare exceptions, courts have been unwilling to start down this path—which has no logical terminus—and we join in this reluctance.

129 F.3d at 686.

Because it produced the documents voluntarily to the DOJ in the hopes of receiving more lenient treatment, compromising the asserted confidentiality of the documents for its own benefit, and because it decided not to assert any privileges when it was appropriate to do so, Chiquita has waived the attorney-client and work product privileges over the documents at issue. The Court has considered the authorities cited by Defendant for a contrary result and finds them inapposite or unpersuasive. *United States v. Stein*, 541 F.3d 130 (2d Cir. 2008) (government inducement of corporation to withhold payment of legal fees for individual officers and employees unjustifiably interfered with right to counsel in violation of Sixth Amendment); *Regents of the Univ. of Cal. v. Super. Ct.*, 165 Cal.App.4th 672, 81 Cal.Rptr.3d 186 (2008) (no waiver "without coercion" within meaning of California Evidence Code achieved through disclosure of documents under operation of DOJ's well publicized cooperation policy,)

### Conclusion

Because Chiquita voluntarily disclosed the documents to the DOJ, it has waived any potentially applicable privileges. Its current objections to production of the subject documents are accordingly overruled, and it is **ORDERED AND ADJUDGED:**

1. The Defendant Chiquita shall produce to the ATS Plaintiffs all documents previously supplied to the DOJ within **TEN (10) DAYS** of the date of entry of this Order.

2. The ATA Plaintiffs' motion to compel specific production of the Valverde and Olivo memoranda is **GRANTED** on ground of waiver arising from the prior DOJ production. With this ruling, it is unnecessary reach the alternative arguments advanced in support of Plaintiffs' motion.

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida this 6th day of September, 2017.