In re GRAND JURY SUBPOENA:
SUBPOENA DUCES TECUM,
Petitioner (Four Cases).

UNITED STATES of America,
Plaintiff-Appellee,

v.

JOHN DOE 819 (MODEL MAGAZINE),
Defendant-Appellant (Two Cases).

UNITED STATES of America,
Plaintiff-Appellee,

v.

JOHN DOE 819 (METRO VIDEO),
Defendant-Appellant (Two Cases).

Nos. 86–5159(L), 86–5171.

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 9, 1986.

Decided Sept. 24, 1987.

Wilkinson, Circuit Judge, concurred
separately and filed opinion.

Herald Price Fahringer (argued), Edward Gasthalter (Ralph J. Schwarz, Jr., New York City, Gerard F. Treanor, Jr., Venable, Baetjer and Howard, McLean, Va., on brief), for defendant-appellant.

Lawrence Joseph Leiser, U.S. Atty., Alexandria, Va., on brief, for plaintiff-appellee.

Before PHILLIPS, ERVIN and WILKINSON, Circuit Judges.

ERVIN, Circuit Judge:

These cases concern the permissible breadth and requisite specificity of a subpoena duces tecum that seeks the production of materials that are presumptively protected under the first amendment to the United States Constitution. The cases arise on a motion to stay a contempt order. In their briefs and oral arguments the parties addressed the merits of the appeal from the contempt order. We therefore treat the issues before us on the merits, instead of limiting our consideration to the narrower request for a stay. Appeal of a civil contempt order is proper in this context. *See United States v. Ryan*, 402 U.S. 530, 532, 91 S.Ct. 1580, 1582, 29 L.Ed.2d 85 (1971); *Cobbledick v. United States*, 309 U.S. 323, 328, 60 S.Ct. 540, 542, 84 L.Ed. 783 (1940).

A party who chooses to run the risk of fines and imprisonment due to contempt can contest the validity of a subpoena in the role of contemner. If the subpoena is even partially bad, the contempt conviction should be reversed. "One should not be held in contempt under a subpoena that is part good and part bad. The burden is on the court to see that the subpoena is good in its entirety and it is not upon the person who faces punishment to cull the good from the bad." *Bowman Dairy v. United States*, 341 U.S. 214, 221, 71 S.Ct. 675, 679, 95 L.Ed. 879 (1951).

The subpoenas duces tecum involved in these cases were served upon appellants Model Distributors and Metro Video Distributors in October, 1986. Appellants, corporations located in New Jersey and New York, are apparently suspected by the government of having sent obscene videotapes into the Washington, D.C. metropolitan area for commercial purposes.[1] The government issued the subpoenas duces tecum in connection with a grand jury investigation into the distribution of obscene materials. The original subpoenas duces tecum were exactly alike. They sought:

1. Corporate tax returns for the years 1980 through 1985.

2. Any and all original records and documents including but not limited to: correspondence, notes, letters, invoices, memoranda, messages, receipts, shipping invoices and records, orders for merchandise, films and video tapes, contracts, license agreements, etc.; in other words, any and all records or documents between, to, from or concerning any of the following entities from 1980 to the present: [naming 11 entities].

3. One copy of any video tape cassette, 8 mm film or 16 mm film that visually depict any of the following:

(a) the use of a minor engaging in sexually explicit conduct, that is:

(1) sexual intercourse, including genital-genital, oral-genital, anal-genital or oral-anal, whether between persons of the same or opposite sex;

(2) bestiality;

(3) masturbation;

(4) sadistic or masochistic abuse; or

(5) lascivious (lewd, lustful) exhibition of the genitals or pubic area.

(b) adults engaging in sexually explicit conduct, that is:

(1) sexual intercourse, involving oral-genital, anal-genital or oral-anal, whether between persons of the same sex or opposite sex;

(2) bestiality;

(3) masturbation;

(4) sadistic or masochistic abuse; or

(5) lascivious (lewd, lustful) exhibition of the genitals or pubic area.

4. For the period 1980 to the present any and all documents and records concerning, referring to, naming, listing or

---

1. Such activity could be found to violate 18 U.S.C. § 1465 (1982), which prohibits the transportation of obscene matters for sale or distribution:

> Whoever knowingly transports in interstate or foreign commerce for the purpose of sale or distribution any obscene, lewd, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, cast, phonograph recording, electrical transcription or other article capable of producing sound or any other matter of indecent or immoral character, shall be fined not more than $5,000 or imprisoned not more than five years, or both....

in any way dealing with any visual depictions, i.e., video tape cassettes, 8 mm films, 16 mm films, etc., where the production of such visual depiction involves: [same categories as above, (a) and (b)].

5. For the period 1980 to the present any and all records and documents that reflect the payment of any things of value including, but not limited to, cash, money, checks, commissions, gifts and gratuities to any officer, employee, consultant, agent or in other words any payment of anything of value made to any individual or entity on behalf of [name of party], including, but not limited to: Forms W–2, 1099, 941 and 940, employee payroll ledgers, payroll account bank statements, cancelled checks, deposit tickets and debit/credit memoranda.

6. For the period 1980 to the present any and all cash receipts, records, cash disbursement records, general journals and ledgers including, but not limited to:

(a) invoices (sales and creditors and shipping receipts);

(b) accounts receivable/payroll;

(c) bank statements, cancelled checks, deposit tickets and debit/credit memoranda; and

(d) records of inventory.

The government met with counsel and the custodian of records for Metro Video Distributors and agreed to modify the subpoena duces tecum in several ways. In particular, Metro Video Distributors explained that it did not deal in tapes involving minors as specified in items 3(a) and 4(a) of the subpoena, so that compliance would consist in a custodian's explaining to the grand jury that no such tapes or records existed. The government postponed compliance on several other items. After a later meeting between the United States Attorney and counsel for Metro Video Distributors, the government agreed to limit the required production under items 3 and 4 to "only those titles which you characterize as x-rated." Model Distributors did not negotiate an agreement with the government.

Both Metro Video Distributors and Model Distributors moved to quash their subpoenas duces tecum in the United States District Court for the Eastern District of Virginia. At separate hearings before the same district court judge, the appellants argued that the production of tapes called for in item 3 of the subpoenas duces tecum was overly burdensome and violated their rights under the first and fourth amendments to the United States Constitution. The district court judge agreed with the government that production of the videotapes was not overly burdensome because the categories in the subpoenas duces tecum were specific. The government urged, and the court accepted, that a business enterprise, no matter how large, that sells videotapes will be familiar enough with the contents of those tapes to comply with subpoenas duces tecum such as these in a relatively short amount of time.

Metro Video Distributors claims to be one of the world's largest distributors of videotapes, with over 200 employees in seven areas around the country and Puerto Rico. Its inventory of videotapes purportedly exceeds 85,000 titles. Metro Video Distributors claims that less than one percent of the tapes that it distributes could be considered "x-rated and/or obscene." In response to the subpoena duces tecum, Metro Video Distributors identified 141 x-rated tapes. However, at the time of the district court's refusal to quash the subpoena, Metro Video Distributors indicated that it would refuse to comply with the item 3 request for the tapes in order to preserve its right to appeal in the posture of a contemner.

Model Distributors claims to distribute roughly 6,000 magazines and paperbacks and approximately 3,000 videotapes each week. Like Metro Video Distributors, it denies handling any items that involve child pornography, although it apparently has, to date, refused to place a corporate custodian on the stand to so testify. Model Distributors claimed in the district court that it had roughly 2,000 videotapes that might contain material described in the subpoena

duces tecum that it had received.[2] Both appellants point out that the titles of videotapes in their inventory and the boxes in which those videotapes are stored do not indicate whether any particular tape contains a "lewd display of genitals" or other form of sexual activity specified in the subpoenas.[3]

For purposes of this appeal, we deal only with those items in the subpoenas duces tecum calling for production of videotapes, packaging in which those tapes are contained,[4] and documents related to tapes involving listed categories of sexual activity. The requests for business records otherwise appear to be clearly delineated and not overly burdensome. It is only as to those items that require a prior identification of videotapes that we are troubled.

Model Distributors refused to produce the requested tapes or the boxes and containers in which they were stored, or documents relating to the sale of such tapes. It is unclear in the record before us whether business and tax records not linked to the videotapes have been satisfactorily produced. Metro Video Distributors apparently complied with the request for tax records and business dealings, but refused

to deliver tapes conforming to the subpoena duces tecum.

The district court judge held Model Distributors in civil contempt and assessed a fine of $1000 for every day that it refused to comply with item 3 of the subpoena. The district court judge refused to stay this order pending appeal. Model Distributors applied for and received a stay from a panel of this court, pursuant to Fed.R. App.P. 8(a). Metro Video Distributors went before the district court thereafter and was held in civil contempt and assessed the same fine. Since we had already granted the motion of Model Distributors for a stay of its contempt order, the district court stayed the contempt order against Metro Video Distributors until December 9, 1986, the date on which we had scheduled expedited oral argument by Model Distributors. We consolidated the motions for purposes of oral argument, and have extended the stay of the contempt order against Metro Video Distributors.

## I.

■ Model Distributors and Metro Video Distributors argue that the subpoenas duces tecum involved in these cases are of

---

**2.** The government has collected all the catalogs, flyers and brochures that Model Distributors uses to solicit business. On the basis of these solicitation materials, the government claims that Model Distributors has, at most, 313 tapes for sale. The discrepancy—between the 2,000 and 313 figures—might be explained by means of the theory that the government advanced at oral argument. The government denied that it could simply put in a purchase order for all the types of tapes that it wanted, because Model Distributors might have other tapes that it was not currently marketing. Whatever the explanation, our analysis of burdensomeness is the same for the 141 tapes of Metro Video Distributors, as well as for the tapes in the possession of Model Distributors, whether those tapes number 313 or 2,000.

**3.** The government produced an affidavit from an agent of the Federal Bureau of Investigation to which was attached a copy of Metro Video Distributors' Fall 1986 catalog for "X-rated Cassettes." The agent claimed that "by their very title I believe [they] may be obscene." There was no claim that the agent had purchased or viewed any films distributed by either appellant. Perhaps the special training of this agent has

heightened his perceptual abilities beyond those of this court; however, it is hard to see what in these titles establishes good cause to believe that they fall into one of the subpoenaed categories. The first five titles are: "8 to 4," "Adam and Yves," "Adventure in San Fenleu," "Adventures of Rick Quick," and "Afternoon Delights." Some further suggestive entries are "Aunt Peg Goes to Hollywood," "Bodacious Ta-Tas," "If My Mother Only Knew," "The Postgraduate," and "Wanda Whips Wall Street."

After oral argument, the government produced an affidavit of a Model Distributors employee that suggests that salesmen can produce individual tapes that conform to the categories in the subpoenas duces tecum. Besides the fact that this affidavit was not before the district court prior to the contempt ruling, it does not establish that either appellant knows the contents of its entire inventory well enough to comply without viewing many tapes.

**4.** The government served a second subpoena on Model Distributors on the date of its initial hearing before the district court judge. This subpoena sought the cartons, boxes, and containers used to store the videotapes referred to in item 3 of the original subpoena.

unprecedented breadth, at least compared to other subpoenas for materials presumptively protected by the first amendment.[5] They assert that these subpoenas are "unreasonable and oppressive" in violation of Fed.R.Crim.P. 17(c),[6] that they constitute a prior restraint and will have a severe chilling effect on distribution of non-obscene videotapes, in violation of the first amendment to the United States Constitution, and that they amount to an unreasonable search and seizure in violation of the fourth amendment.[7] These claims must be considered together, because the first amendment context of these proceedings heightens the concern about burdensomeness and fourth amendment violations. Although there are no directly applicable privileges arising out of the constitutional claims in these cases, those constitutional claims do color the analysis of burdensomeness under Fed.R.Crim.P. 17(c).

■ It is well established that a district court judge normally has considerable discretion in making findings under Fed.R.Crim.P. 17(c), at least outside the first amendment context. *See, e.g., United States v. Nixon,* 418 U.S. 683, 702, 94 S.Ct. 3090, 3104, 41 L.Ed.2d 1039 (1974); *Matter of Klein,* 776 F.2d 628, 635 (7th Cir.1985); *In Re Grand Jury Matters,* 751 F.2d 13, 16 (1st Cir.1984). It is equally obvious that such discretion must be exercised carefully. *Klein,* 776 F.2d at 635; *In Re Grand Jury Proceedings,* 601 F.2d 162, 170 (5th Cir. 1979); *cf. Nixon,* 418 U.S. at 702 (special circumstances may require appellate review to be "particularly meticulous"). Subpoenas duces tecum are not insulated from review merely because they are issued in connection with a sitting grand jury. They are issued pro forma with no prior court approval. As such they are instrumentalities of the United States Attorney's office

---

**5.** That these videotapes are presumptively protected is clear. *See, e.g., Burstyn v. Wilson,* 343 U.S. 495, 501, 72 S.Ct. 777, 780, 96 L.Ed. 1098 (1951). The government's assertion that the categories of sexual activity to which the subpoenas duces tecum refer are the same as those categories mentioned in *Miller v. California,* 413 U.S. 15, 25, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973), does not transform the subpoenaed materials into "presumptively obscene" matter outside of first amendment protection. It remains true that "[s]ex and obscenity are not synonymous," *Roth v. United States,* 354 U.S. 476, 487, 77 S.Ct. 1304, 1310, 1 L.Ed.2d 1498 (1957), so that the graphic depiction of sexual activity does not automatically push material beyond first amendment pale. The *Miller* definition of obscenity includes the requirements of "an average person, applying contemporary community standards," finding "the work, taken as a whole" appealing to "the prurient interest," 413 U.S. at 24, 93 S.Ct. at 2615, as well as the requirement of no "serious literary, artistic, political, or scientific value." *Id.* All of these guidelines must be considered by a trier of fact before material is legally considered "obscene." That is not an easy task for a neutral, detached magistrate. *See* Lockhart, "Escape from the Chill of Uncertainty: Explicit Sex and the First Amendment," 9 Ga.L.Rev. 533, 545–56 (1975); Gelhorn, "Dirty Books, Disgusting Pictures, and Dreadful Laws," 8 Ga.L.Rev. 291, 294–301 (1974). It is obviously not a task that the government can shift to a private party merely by issuing a subpoena duces tecum listing categories of sexual activity. Nor do we think that the affidavit of the FBI agent, *supra* note 3, could possibly move all of the appellants' inventory outside first amend-

ment protection. The agent did not even claim to have seen any tapes.

**6.** (c) For Production of Documentary Evidence and of Objects. A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein. *The court on motion made promptly may quash or modify the subpoena if compliance would be unreasonable or oppressive.* Fed.R.Crim.P. 17(c) (emphasis added).

**7.** Appellants also appear to have advanced the argument below that production of the subpoenaed documents would violate their fifth amendment privileges under the "act of production" doctrine. *See United States v. Doe,* 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984); *Fisher v. United States,* 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). The fifth amendment claim has not been advanced on appeal. We note in passing that this circuit has explicitly held that *Doe* did not change the long-standing rule that collective entities cannot assert fifth amendment privileges, for which see *Bellis v. United States,* 417 U.S. 85, 88, 94 S.Ct. 2179, 2183, 40 L.Ed.2d 678 (1974), and that in the case of summonses for corporate documents, an individual's "act of production" privilege will not bar enforcement against the corporation. *See United States v. Lang,* 792 F.2d 1235 (4th Cir. 1986); *see also In re Grand Jury Subpoena (85–W–71–5),* 784 F.2d 857 (8th Cir.1986), *cert. dismissed, See v. United States,* — U.S. —, 107 S.Ct. 918, 93 L.Ed.2d 865 (1987); *In re Grand Jury Subpoena Duces Tecum,* 769 F.2d 52 (2d Cir.1985).

although issued under the district court's name and for the grand jury.

■ The grand jury's investigative powers are broad; its inquiries generally are "not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation...." *Blair v. United States*, 250 U.S. 273, 282, 39 S.Ct. 468, 471, 63 L.Ed. 979 (1919); *see also United States v. Bisceglia*, 420 U.S. 141, 147, 95 S.Ct. 915, 919, 43 L.Ed.2d 88 (1975); *United States v. Powell*, 379 U.S. 48, 57, 85 S.Ct. 248, 255, 13 L.Ed.2d 112 (1964). But "the powers of the grand jury are not unlimited...." *Branzburg v. Hayes*, 408 U.S. 665, 682, 92 S.Ct. 2646, 2657, 33 L.Ed.2d 626 (1972); *accord United States v. Calandra*, 414 U.S. 338, 346, 94 S.Ct. 613, 619, 38 L.Ed.2d 561 (1974). The subpoena duces tecum "remains at all times under the control and supervision of a court." *United States v. Doe (Schwartz)*, 457 F.2d 895, 898 (2d Cir.1972). Beyond the explicit strictures of Fed.R.Crim.P. 17(c), the Constitution guards against abusive subpoenas duces tecum. "The Fourth Amendment provides protection against a grand jury subpoena duces tecum too sweeping in its terms 'to be regarded as reasonable.'" *United States v. Dionisio*, 410 U.S. 1, 11, 93 S.Ct. 764, 770, 35 L.Ed.2d 67 (1973) (quoting *Hale v. Henkel*, 201 U.S. 43, 76, 26 S.Ct. 370, 380, 50 L.Ed. 652 (1906)); *Dionisio*, 410 U.S. at 47–50, 93 S.Ct. at 789–790 (Marshall, J., dissenting).[8] And the Court has made clear that the context of the first amendment intensifies the fourth amendment concerns that may be present in a sweeping subpoena duces tecum. *Branzburg*, 408 U.S. at 707–08, 92 S.Ct. at 2669–70 ("We do not expect that courts will forget that grand juries must operate within the limits of the First Amendment...."); *id.* at 710, 92 S.Ct. at 2671 (Powell, J., concurring).

■ In sum, the fact that grand juries must have broad investigative powers does not resolve all questions of the permissible breadth and requisite specificity of a subpoena duces tecum. The public's undoubted "right to every man's evidence," *Branzburg*, 408 U.S. at 688, 92 S.Ct. at 2660, does not give government, for example, "an unlimited right of access to [private parties'] papers with reference to the possible existence of [illegal] practices." *Federal Trade Commission v. American Tobacco Co.*, 264 U.S. 298, 305, 44 S.Ct. 336, 337, 68 L.Ed. 696 (1924). "It is contrary to the

---

**8.** In the case of *Hale v. Henkel,* Hale received a subpoena duces tecum commanding that he bring before a grand jury:

1. All understandings, agreements, arrangements, or contracts, whether evidenced by correspondence, memoranda, formal agreements, or other writings, between [his company] and six other firms and corporations named, from the date of the organization of [his company].

2. All correspondence by letter or telegram between [his company] and six other firms and corporations.

3. All reports made or accounts rendered by these six companies or corporations to the principal company.

4. Any agreements or contracts, or arrangements, however evidenced, between [his company and two others].

5. All letters received by [his company] since the date of its organization from thirteen other companies named, located in different parts of the United States, and also copies of all correspondence with such companies.

201 U.S. at 45, 26 S.Ct. at 371–72. The Court noted that a subpoena duces tecum could be an unreasonable search and seizure within the fourth amendment, and held:

Applying the test of reasonableness to the present case, we think the subpoena duces tecum is far too sweeping in its terms to be regarded as reasonable. It does not require the production of a single contract, or of contracts with a particular corporation, or a limited number of documents, but all understandings, contracts, or correspondence between the MacAndrews & Forbes Company, and no less than six different companies....

[T]his mass of material ... is not shown to be necessary in the prosecution of this case, and is clearly in violation of the general principle of law with regard to the particularity required in the description of documents necessary to a search warrant or subpoena. Doubtless many, if not all, of these documents may ultimately be required, but some necessity should be shown, either from an examination of the witnesses orally, or from the known transactions of these companies with the other companies implicated, or some evidence of their materiality produced, to justify an order for the production of such a mass of papers. *A general subpoena of this description is equally indefensible as a search warrant would be if couched in similar terms.*

201 U.S. at 76, 26 S.Ct. at 380 (emphasis added).

first principles of justice to allow a search through all [a corporation's] records, relevant or irrelevant, in the hope that something will turn up." *Id.* A court, in deciding to enforce or to quash a subpoena duces tecum that broadly seeks material presumptively protected by the first amendment, must balance these concerns: on the one hand, the interest of the public and the government in ferreting out crime, on the other, the interest of the subpoena's target in conducting a business or any other personal affairs. The critical inquiry, assuming that the hurdle of relevancy has been cleared, is whether there is too much indefiniteness or breadth in the things required to be produced by the subpoena. *See Oklahoma Press Publishing Co. v. Walling,* 327 U.S. 186, 208, 66 S.Ct. 494, 505, 90 L.Ed. 614 (1945). The district court below showed no sensitivity to the need for such balancing and ordered enforcement of the subpoena on a rationale that we find chilling, as that word has come to be understood in the jurisprudence of the first amendment.

## II.

The district court ordered enforcement of the subpoenas duces tecum despite the appellants' claims that they would have to spend countless hours viewing large numbers of tapes before they could know which tapes contained the subpoenaed categories of sexual activity. The district court rejected appellants' protestations on the theory that a business can be presumed to have knowledge of the specific contents of its inventory. In response to questions about burdensomeness, the government again underscored this theory in oral argument before this court.

■ This theory helps explain why the subpoenas duces tecum before us are not permissible. These subpoenas duces tecum are examples of those "legal devices and doctrines, in most applications consistent with the Constitution," but "which cannot be applied in settings where they have the collateral effect of inhibiting the freedom of expression, by making the individual the more reluctant to exercise it." *Smith v. California,* 361 U.S. 147, 150–51, 80 S.Ct. 215, 217, 4 L.Ed.2d 205 (1959). *Smith* forthrightly rejects the rationale urged by the government and applied by the district court in these cases to find that the subpoenas were not burdensome. That rationale is that a seller of books or movies can be presumed to have knowledge of all the contents of his wares. This presumption flies in the face of an important tenet of our system of free expression: "a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser." *Id.; see also Winters v. New York,* 333 U.S. 507, 510, 517, 518, 68 S.Ct. 665, 667, 671, 761, 92 L.Ed. 840 (1948).

Like the statute struck down in *Smith,* the practice of issuing subpoenas like these and then expecting vendors to comply based on their imputed knowledge of the contents of their inventories would tend seriously to restrict the dissemination of books and movies that are not obscene. Book and movie sellers would have an incentive "to restrict the books [or movies they] sell to those [they] have inspected; and thus the State will have imposed a restriction upon the distribution of constitutionally protected as well as obscene literature." *Smith,* 361 U.S. at 153, 80 S.Ct. at 218; *see also A Quantity of Copies of Books v. Kansas,* 378 U.S. 205, 210, 84 S.Ct. 1723, 1725, 12 L.Ed.2d 809 (1964) ("State regulation of obscenity must 'conform to procedures that will ensure against the curtailment of constitutionally protected expression, which is often separated from obscenity only by a dim and uncertain line.'") (quoting *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 66, 83 S.Ct. 631, 637, 9 L.Ed.2d 584 (1963)).

■ Thus, even though the subpoenas duces tecum herein involved do not amount to a "prior restraint" on publication,[9] they

---

9. The government sought only one copy of every requested tape. This distinguishes this case from those cases involving massive seizures of books that amounted to prior restraint. *See, e.g., A Quantity of Copies of Books v. Kansas,* 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809

exert a powerful chilling effect as enforced by the district court. First amendment rights do not vanish completely in the absence of prior restraint. *See, e.g., Heller v. New York,* 413 U.S. 483, 492, 93 S.Ct. 2789, 2795, 37 L.Ed.2d 745 (1973) (seizure of a single copy of a film is constitutionally permissible "if pursuant to a warrant, issued after a determination of probable cause by a neutral magistrate, and, following the seizure, a prompt judicial determination of the obscenity issue in an adversary proceeding is available at the request of any interested party"). First amendment rights need "breathing space to survive," *National Association for the Advancement of Colored People v. Button,* 371 U.S. 415, 433, 83 S.Ct. 328, 338, 9 L.Ed.2d 405 (1963), and courts are to protect them "not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental influence." *Bates v. Little Rock,* 361 U.S. 516, 522, 80 S.Ct. 412, 416, 4 L.Ed.2d 480 (1960). The Supreme Court has demonstrated its willingness to curtail investigations by means of subpoenas, even those issued by legislative bodies, when the means of investigation intrude on the first amendment rights of parties who have not been demonstrated to have acted illegally. *See Gibson v. Florida Investigation Committee,* 372 U.S. 539, 544, 545, 558, 83 S.Ct. 889, 899, 9 L.Ed.2d 929 (1963). The task of weighing competing concerns in a case such as this one is "delicate and difficult" and a court must not give short shrift to the party asserting private constitutional rights. *Schneider v. State (Town of Irvington),* 308 U.S. 147, 161, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939).

### III.

The absence of a prior restraint also diminishes, but does not cancel, the fourth amendment concerns [10] presented by overly broad subpoenas duces tecum directed to material [11] presumptively protected under the first amendment. When govern-

(1964); *Marcus v. Search Warrant,* 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961). The "substantial restraint" that a party must prove in order to invoke the nearly absolute prohibition against pre-publication hindrances is absent from these cases. *See New York v. P.J. Video,* 475 U.S. 868, 106 S.Ct. 1610, 89 L.Ed.2d 871 (1986); *Heller v. New York,* 413 U.S. 483, 490, 93 S.Ct. 2789, 2793, 37 L.Ed.2d 745 (1973). *But see Roaden v. Kentucky,* 413 U.S. 496, 504, 93 S.Ct. 2796, 2801, 37 L.Ed.2d 757 (1973) ("[W]ithout the authority of a constitutionally sufficient warrant, [seizure] is plainly a form of prior restraint and is, in those circumstances, unreasonable under fourth amendment standards.").

10. The sine qua non of such concerns is an expectation of privacy on the part of the party asserting the fourth amendment. *See United States v. Miller,* 425 U.S. 435, 443, 444 n. 6, 96 S.Ct. 1619, 1624, 1625 n. 6, 48 L.Ed.2d 71 (1976) ("narrowly directed subpoenas duces tecum"); *United States v. Dionisio,* 410 U.S. 1, 13–15, 93 S.Ct. 764, 771–72, 35 L.Ed.2d 67 (1973). But overbreadth in a subpoena duces tecum can itself require attention to fourth amendment standards of reasonableness. *See Dionisio,* 410 U.S. at 15 n. 13, 93 S.Ct. at 772 n. 13; *Hale v. Henkel,* 201 U.S. at 77, 26 S.Ct. at 380 (1906). In many cases similar to this one there will be no expectation of privacy, because the goods seized will have been held out to the public for sale. However, this is the case envisioned by *Dionisio* and *Hale* in which the subpoenas duces tecum go beyond matters held out to the public. The government made this clear at oral argument when it denied that it could have simply purchased hardcore tapes from Model Distributors and Metro Video Distributors. The government suggested that the appellants may have tapes that were not up for sale, but that should go before the grand jury. To the extent that this is true, some of the subpoenaed material is not held out to the public and its seizure is subject to fourth amendment concerns. To the extent it is not true, the tapes could have been procured in a less onerous manner.

11. The subpoenas duces tecum are actually directed, of course, to corporations in this case. Corporations do not have the equivalent privacy rights of individuals. *See United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 407 (1950) (noting, however, that an overly broad investigation exceeds the government's power and that the demands or requests for information must be "not too indefinite"). But unlike the fifth amendment, which is wholly inapplicable to artificial entities, there are fourth-amendment-based reasonability limits on searches and seizures of corporate documents. *See Mancusi v. De Forte,* 392 U.S. 364, 88 S.Ct. 2110, 20 L.Ed.2d 1154 (1968); *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920) (Holmes, J.). *But cf. United States v. Calandra,* 414 U.S. 338, 352 n. 8, 94 S.Ct. 613, 622 n. 8, 38 L.Ed.2d 561 (1974) (limiting the exclusion of evidence from a *Silverthorne* violation).

mental searches trench on first amendment concerns, courts have been careful to scrutinize the searches much more closely than the district court did in this case. "The setting of the bookstore or the commercial theater, each presumptively under the protection of the First Amendment, invokes such Fourth Amendment ... requirements because we examine what is 'unreasonable' in light of the values of freedom of expression." *Roaden v. Kentucky*, 413 U.S. 496, 504, 93 S.Ct. 2796, 2801, 37 L.Ed.2d 757 (1973). In *New York v. P.J. Video, Inc.*, 475 U.S. 868, 106 S.Ct. 1610, 89 L.Ed.2d 871 (1986), the Court held that a magistrate need not personally view allegedly obscene films prior to issuing a warrant authorizing their seizure, *id.* at 874 n. 5, 106 S.Ct. at 1614 n. 5, and that the standard of probable cause is the same for a seizure in a first amendment context as in any other. *Id.* But the Court reaffirmed that "[w]e have long recognized that the seizure of films or books on the basis of their content implicates First Amendment concerns not raised by other kinds of seizures. For this reason, we have required that certain special conditions be met before such seizures may be carried out." *Id.* at 873, 106 S.Ct. at 1614; *see also Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 326 n. 5, 99 S.Ct. 2319, 2324 n. 5, 60 L.Ed.2d 920 (1979) (first amendment imposes special constraints on searches for and seizures of presumptively protected material); *Stanford v. Texas*, 379 U.S. 476, 485, 85 S.Ct. 506, 511, 13 L.Ed.2d 431 (1965) (first amendment requires that the fourth amendment be applied with "scrupulous exactitude").

■ Even when the first amendment and fourth amendment problems raised by subpoenas duces tecum do not, in and of themselves, rise to the level of constitutional violations, the concerns that underlie those constitutional provisions must enter into the balancing of interests that is required by a motion to quash under Fed.R. Crim.P. 17(c). *See, e.g., In Re Grand Jury Matters*, 751 F.2d at 18. This rule of criminal procedure encapsulates the constitutional choices that must be made by a court reviewing a motion to quash a subpoena duces tecum. *See Oklahoma Press Publishing Co.*, 327 U.S. at 209, 66 S.Ct. at 506 ("[T]he requirement of reasonableness, including particularity in describing 'the place to be searched, and the persons or things to be seized,' also literally applicable to warrants, comes down to specification of the documents to be produced adequate, but not excessive, for the purposes of the relevant inquiry"). The Court in *Oklahoma Press* adverted to the danger of overbreadth associated with subpoenas: "it can be time consuming, clogging the processes of business. It can become persecution when carried beyond reason." *Id.* at 213, 66 S.Ct. at 508.

■ In these cases, the district court ordered Model Magazine to peruse what it claimed were 2,000 tapes for instances of the subpoenaed sexual activity. In the case of Metro Video, while the pool of tapes to be searched was reduced through negotiation to 141, it would still have been quite onerous to comply. The normal subpoena duces tecum can impose heavy burdens of time and cost,[12] but these are not normal subpoenas duces tecum: they are directed to material that is presumptively protected under the first amendment. The government's strategy would impose heavy

---

**12.** These subpoenas should be distinguished from tax summonses as regards the breadth of materials sought. Very broad tax summonses have been upheld against charges of overbreadth under the fourth amendment. *See, e.g., United States v. Arthur Young*, 677 F.2d 211, 216 (2d Cir.1982) (requiring production of 250,000 pages of documents relating to the tax liability of Amerada Hess Corp. because "before the Service knows what the documents contain, it cannot describe them with any specificity"). *But see United States v. Richards*, 631 F.2d 341, 346 (4th Cir.1980) (tax summons should be as narrow as possible); *United States v. Theodore*, 479 F.2d 749, 754 (4th Cir.1973) (same). The reasoning that the Second Circuit used to justify a very broad summons is inapposite in the instant case, where federal investigators could quite easily have posed as buyers and sought the most obscene literature that appellants would sell them. The literature at issue, unlike tax documents, is either available for purchase or else not held out to the public, and hence private material. *But cf. United States v. Rosinsky*, 547 F.2d 249, 253 (4th Cir.1977) (subpoenas are analogous to tax summonses with regard to fourth amendment claims concerning handwriting exemplars).

costs on distributors of videotapes simply because the government suspects some of their inventories to be obscene.

We find such a strategy to be "unreasonable and oppressive" where, as here, there has been no attempt to take the much less drastic means of buying the tapes and then subjecting them to a determination of obscenity in the eyes of the grand jury or a magistrate before issuing a subpoena duces tecum for particular tapes. *See In Re Petroleum Products Litigation,* 680 F.2d 5, 8–9 (2d Cir.1982); *In Re Grand Jury Proceedings Witness Bardier,* 486 F.Supp. 1203, 1210 (D.Nev.1980); *cf. Branzburg v. Hayes,* 408 U.S. at 706–07, 92 S.Ct. at 2669 (noting Justice Department guidelines admonishing that "all reasonable attempts ... be made to obtain information from non-press sources before there is any consideration of subpoenaing the press").[13]

## IV.

We are also troubled by the vagueness of the subpoenas' requirement to turn over tapes that have "lewd or lascivious displays of genitals or the pubic area." This is inherently nonspecific; it asks a vendor to determine what judges have had great difficulty determining: that "present critical point in the compromise between candor and shame at which the community may have arrived here and now." *United States v. Kennerley,* 209 F. 119, 121 (S.D.N.Y.1913) (Learned Hand, J.). One who is subpoenaed in such a fashion risks contempt for having a conception of lewdness or lasciviousness that differs from that of the community at large. A subpoena duces tecum should not require the recipient to determine at his own peril what he is to do, without clear guidelines for compliance. *See In Re Grand Jury Proceedings,* 601 F.2d 162, 170 (5th Cir. 1979); *cf. United States v. Richards,* 631 F.2d 341, 346 (4th Cir.1980) ("specific questions directing the taxpayer's attention to

areas of genuine concern to the Service are more appropriate than broad and general inquiries calling for subjective interpretation by the respondent under the threat of perjury"). Item 3(b)(5), which uses this "lewd or lascivious" standard, is the most egregious example of the "false particularity" of the subpoenas duces tecum before us. In general, the *categories of sexual activity* described in the subpoenas duces tecum are reasonably specific, but the *videotapes to which those categories apply* are not particularized at all. For this reason, the recipient of such a subpoena duces tecum is further placed at risk, beyond the fact that he is charged with knowledge of the contents of all his inventory. He must make judgment calls on the line between "lewd" and "erotic," at the risk of a civil contempt conviction. A subpoena duces tecum should be particular in a way that leaves as little discretion as possible to the recipient. *Cf. Zurcher v. Stanford Daily,* 436 U.S. 547, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978) ("Where presumptively protected materials are sought to be seized, the warrant requirement should be administered to leave as little as possible to the discretion or whim of the officer in the field.").

## V.

We return to the inquiry under Fed.R.Crim.P. 17(c) with this constitutional background in mind. The traditional requirements for reviewing subpoenas duces tecum against charges of burdensomeness must be applied with greater care in cases such as these. Those requirements were enumerated in *United States v. Nixon,* wherein Chief Justice Burger wrote:

A subpoena for documents may be quashed if their production would be "unreasonable or oppressive," but not otherwise. The leading case in this Court interpreting this standard is *Bowman Dairy Co. v. United States,* 341 U.S. 214 [71 S.Ct. 675, 95 L.Ed. 879]

---

**13.** Less drastic means of accomplishing governmental ends have often been required of statutes that impinge on the first amendment. *E.g., United States v. Robel,* 389 U.S. 258, 268, 88 S.Ct. 419, 426, 19 L.Ed.2d 508 (1967); *Sherbert v. Verner,* 374 U.S. 398, 407, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963); *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *Thornhill v. Alabama,* 310 U.S. 88, 98, 60 S.Ct. 736, 742, 84 L.Ed. 1093 (1940); *see* Note, Less Drastic Means and the First Amendment, 78 Yale L.J. 464 (1969).

(1951). This case recognized certain fundamental characteristics of the subpoena duces tecum in criminal cases: (1) it was not intended to provide a means of discovery for criminal cases ...: (2) its chief innovation was to expedite the trial by providing a time and place before trial for the inspection of subpoenaed materials. As both parties agree, cases decided in the wake of *Bowman* have generally followed Judge Weinfeld's formulation in *United States v. Iozia*, 13 FRD 335, 338 (S.D.N.Y.1952), as to the required showing. Under this test, in order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that application is made in good faith and is not intended as a general "fishing expedition."

Against this background, the Special Prosecutor, in order to carry his burden, must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity.

418 U.S. at 699, 94 S.Ct. at 3103.[14] The subpoenas duces tecum before us in these cases must be quashed, for the presumptively protected materials they seek are otherwise procurable, and in a less intrusive manner; the specificity of the subpoenas is illusory, since the categories described do not refer to particular tapes; as a result, the corporations before us would be required to perform burdensome searches and would be at risk for failing to fulfill vague requirements; in sum, the government appears to be engaging in a paradigmatic "fishing expedition." Since the district court made no careful finding, on the record, as to how the recipients of the subpoenas duces tecum could produce the requested tapes without spending hundreds of hours viewing them, we find the refusal to quash the subpoenas duces tecum arbitrary and we reverse the conviction for civil contempt.[15] In the future, when the government seeks to subpoena material that is presumptively protected by the first amendment, it should do so in the least intrusive manner possible, which means, at a minimum, by identifying the requested material in a way that allows the recipient of the subpoena to know immediately whether an item is to be produced or not. And in reviewing motions to quash such subpoenas duces tecum, district courts should balance the first and fourth amendment interests at stake against the marginal gain to the issuer of the subpoena in describing the materials by means other than the title of the work.

REVERSED.

WILKENSON, Circuit Judge, concurring separately:

I too would quash the subpoena and reverse the conviction for contempt. I would do so, however, for different reasons than those advanced by the majority.

---

**14.** The *Nixon* Court was not reviewing a subpoena duces tecum in connection with a grand jury investigation, but we find that its gloss on Fed. R.Crim.P. 17(c) is equally applicable in this case.

**15.** Contrary to the concurring opinion's reading of this reversal, we do not hold that any subpoena that targets the named categories of sexual activity must be quashed, or that degrading forms of obscenity are shielded from the reach of the grand jury. We insist only that the guarantees of the first and fourth amendments not be trampled by overly broad subpoenas. In particular, we simply identify the following ways in which these subpoenas are objectionable: they put sellers of presumptively protected material at risk identifying which tapes are being sought; they attempt to force sellers with large inventories of presumptively protected material to spend unknown hours reviewing tapes on the theory that such sellers are charged with knowledge of all particulars of their inventory, despite the rule of *Smith v. California;* they show no evidence of any prior review of the subpoenaed materials by anyone other than the FBI agent who believed the titles alone revealed obscenity; and they are, as the concurring opinion admits, hopelessly vague. The concurring opinion notes, in part II.C., that a grand jury subpoena must not be unduly burdensome. That opinion fails to explain, however, what is meant by this prohibition.

In my view, both the government and the majority are guilty of excess. The government has drafted a subpoena whose vague and subjective boundaries threaten legitimate forms of artistic expression. The majority has shielded from the reach of the grand jury the most dehumanizing forms of pornography, which Congress has repeatedly condemned and the Supreme Court has repeatedly held is unprotected.

I would permit a grand jury to subpoena a single copy of a distributor's video tape if there is a strong possibility that the film would be obscene and the subpoena does not excessively burden the distributors. Under this standard, the grand jury's request for films that contain scenes of specific sexual acts should be upheld. There is a strong possibility that those films may be obscene and compliance with the subpoena will not burden the distributors because the acts are specifically described.

In particular, I would uphold this subpoena insofar as it seeks any sexually explicit film involving minors or any film depicting adults engaging in bestiality, masturbation, sadistic or masochistic abuse, or the various forms of sexual intercourse described in the subpoena.

The remainder of the subpoena, calling for films with "lascivious, lewd, or lustful exhibition of the genitals or pubic area" should be quashed. While no one condones such depictions, those terms are hopelessly vague, which makes compliance difficult, and may both inhibit the production of and require the surrender of films that are not obscene. Because this portion of the subpoena is invalid, I would quash the subpoena in its entirety.

## I.

This case presents new and difficult questions with respect to grand jury subpoena powers. The historic deference accorded the subpoena power collides here with historic protections of First Amendment rights. It is true that the grand jury has traditionally been able to subpoena any evidence that is marginally relevant to its investigation; the Supreme Court has consistently declined to impose any restrictions on this broad investigatory power. This tradition of deference must end, however, when a grand jury begins to investigate the content of films or other presumptively protected modes of expression.

The Supreme Court has generally accorded the subpoena powers of the grand jury great respect. "Because its task is to inquire into the existence of possible criminal conduct and to return only well-founded indictments, [the grand jury's] investigatory powers are necessarily broad." *Branzburg v. Hayes,* 408 U.S. 665, 688, 92 S.Ct. 2646, 2660, 33 L.Ed.2d 626 (1972). These broad powers allow the grand jury to "compel the production of evidence or the testimony of witnesses as it considers necessary or appropriate, and its operation generally is unrestrained by the technical procedural and evidentiary rules governing the conduct of criminal trials." *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974). The Court has been unwilling to restrict these powers because "a grand jury investigation is not fully carried out until every available clue has been run down and all witnesses examined in every proper way." *United States v. Dionisio,* 410 U.S. 1, 13, 93 S.Ct. 764, 771, 35 L.Ed.2d 67 (1973).

The majority would require the prosecution to purchase individual tapes and submit them for prior review before a subpoena may issue. In addition to the traditional restraints upon the subpoena power, the majority has thus imposed upon the grand jury a "least drastic means" test. *Ante,* p. 1301. In doing so, the majority is marching ahead of the Supreme Court, which has not suggested a least drastic means test for grand jury investigations of obscenity and which has supported the grand jury's investigative powers even when constitutional values may be implicated. For example, the grand jury may question a suspect outside the presence of his attorney, *United States v. Mandujano,* 425 U.S. 564, 581, 96 S.Ct. 1768, 1779, 48 L.Ed.2d 212 (1975); a grand jury may use illegally-seized evidence, *United States v. Calandra,* 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); a grand jury subpoena to testify is not a seizure under the Fourth Amend-

ment, *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973); and the grand jury does not have to give *Miranda* warnings before questioning a suspect. *Mandujano*, 425 U.S. at 580–81, 96 S.Ct. at 1778.

In keeping with this spirit of deference, the circuit courts have also allowed a grand jury to subpoena virtually any relevant evidence. "Once it is shown that a subpoena might aid the grand jury in its investigation, it is generally recognized that the subpoena should issue." *In re Antitrust Grand Jury Investigation*, 714 F.2d 347, 350 (4th Cir.1983). The party seeking to quash a subpoena must usually show that the requested information bears "no conceivable relevance to any legitimate objective of investigation by the federal grand jury." *In re Liberatore*, 574 F.2d 78, 83 (2d Cir.1978); *In Re Grand Jury Subpoena (Battle)*, 748 F.2d 327, 330 (6th Cir. 1984). If we applied this lenient standard, Metro Video and Model Distributors would have to comply with the subpoena because the requested tapes are at least minimally relevant to the grand jury's obscenity investigation.

When applied to the run-of-the-mill grand jury subpoena, this deferential approach is certainly appropriate. A grand jury inquiry may be less intrusive and adversarial than other criminal investigations. Unlike a police investigation, the grand jury does not stake out residences and businesses; procure evidence under false identities and pretenses; search homes, offices, or automobiles; or arrest suspects.

In particular, a grand jury subpoena may be a less drastic means of investigating obscenity violations than would purchases by the police. A subpoena remains subject to judicial control. *See Dionisio*, 410 U.S. at 9–11, 93 S.Ct. at 769–70. A subpoena by its terms limits what must be produced, while the only limit on a prosecutor's purchases is the size of his budget. Moreover, a narrowly crafted and openly served subpoena will inhibit the sale and distribution of protected materials far less than a random series of surreptitious purchases by

prosecutors and police. Why the majority takes any comfort in police purchases of tapes and films is inexplicable.

Although a grand jury subpoena may be an appropriate form of investigation, it nonetheless raises substantial First Amendment concerns in this case. When the grand jury subpoenas the films or cassettes sold by a distributor, it does more than require the distributor to deliver one copy of these items; it puts the distributor and everyone in the community on notice that if they continue to sell such matter, they will be investigated and prosecuted. So long as the objects of the subpoena power are patently obscene, such *ad terrorem* tactics may escape constitutional censure. But the border zones of constitutional liberty must remain free of encroachment. Faced with sufficiently broad subpoenas and sufficiently serious threats of indictment, not only distributors—but the general community of artists, sculptors, painters and photographers may be reluctant to render erotic or sensual depictions of any sort, including those that would not be found obscene. Subpoenas of this kind could deal a terrible blow to the vitality of artistic life, for the artist's imagination should not be chained to what conventional tastes deem polite and acceptable.

Despite the strong tradition of judicial deference, therefore, a grand jury does not have the unlimited right to chill protected speech. *See In re Grand Jury Proceedings*, 776 F.2d 1099, 1102–03 (2d Cir.1985); *Ealy v. LittleJohn*, 569 F.2d 219, 226–27 (5th Cir.1978). A grand jury subpoena is "not ... some talisman that dissolves all constitutional protections." *Dionisio*, 410 U.S. at 11, 93 S.Ct. at 770. Like any instrument of government, the grand jury must abide by the limits of the First Amendment. "No governmental door can be closed against the Amendment. No governmental activity is immune from its force." *Bursey v. United States*, 466 F.2d 1059, 1082 (9th Cir.1972). As the Supreme Court has explicitly noted, "we do not expect courts will forget that grand juries must operate within the limits of the First Amendment." *Branzburg*, 408 U.S. at 708, 92 S.Ct. at 2670.

Of course, the First Amendment does not prevent a grand jury from investigating criminal obscenity violations; the purveyors of obscenity cannot use the First Amendment as a shield against all governmental inquiry. A grand jury may subpoena certain categories of films, but only where there exists a strong possibility that those films may be obscene and where the subpoena is not excessively burdensome.

## II.

The difficulty in this case, therefore, is determining when the grand jury's need for the films outweighs the restrictive effect of its subpoena. Two circuit courts have dealt with grand jury investigations that infringed on the First Amendment rights of speech and association. Under the approach applied in these cases, a grand jury could investigate in a protected area if (A) the subpoena served a compelling state interest, (B) it requested evidence that was substantially related to the investigation, and (C) it did not unduly burden the witness. *In re Grand Jury Proceedings*, 776 F.2d 1099 (2nd Cir.1985); *Bursey v. United States*, 466 F.2d 1059 (9th Cir. 1972). This approach is appropriate here because it allows a grand jury to subpoena films that will directly assist its obscenity investigation, but prevents the grand jury from inhibiting the circulation of expression that may well not be obscene.

### A.

The first element of this approach requires that the subpoena must serve a compelling state interest. Most grand jury subpoenas satisfy this initial requirement because, if the grand jury is conducting a good faith investigation of crime, the subpoena serves a compelling state interest. *Branzburg*, 408 U.S. at 700, 92 S.Ct. at 2666; *In re Grand Jury Proceedings*, 776 F.2d at 1103. The determination of whether a compelling state interest is present does not turn on what type of crime the grand jury is investigating; the courts will not assign different values to a grand jury subpoena depending on the particular crime

under investigation. *Branzburg*, 408 U.S. at 705–06, 92 S.Ct. at 2668–69.

This requirement is only intended to prevent a grand jury from issuing a subpoena for the sole purpose of harrassment and intimidation. *Cf. Ealy v. LittleJohn*, 569 F.2d 219, 227–30 (5th Cir.1978). The subpoena issued in this case serves a compelling state interest; there is every reason to believe that the grand jury is investigating Metro and Model for criminal activity in violation of 18 U.S.C. § 1465 (1982), which prohibits the interstate sale or distribution of obscene materials.

### B.

If the grand jury is conducting a good faith investigation into possible criminal activity, the second element of the test allows it to subpoena films that are substantially related to the investigation. This element strikes the essential balance between the purposes of the grand jury and the protections of the First Amendment. Under this balance, the grand jury cannot restrict presumptively protected modes of expression simply because there is a slight chance that the film will assist the investigation. To subpoena such films, the grand jury must show a strong possibility that the requested films will expose criminal activity. *In re Grand Jury Proceedings*, 776 F.2d at 1103; *Bursey*, 466 F.2d at 1083.

Because the grand jury is conducting an obscenity investigation, the subpoenaed films are substantially related only if there is a strong possibility that the films are obscene. Of course, this is an area where definitional difficulties abound. The Supreme Court has struggled mightily to locate the point of protection along the continuum of speech. *See, e.g., Roth v. United States*, 354 U.S. 476, 487–89, 77 S.Ct. 1304, 1310–11, 1 L.Ed.2d 1498 (1957); *Memoirs v. Massachusetts*, 383 U.S. 413, 418–20, 86 S.Ct. 975, 977–78, 16 L.Ed.2d 1 (1966); *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973); *New York v. Ferber*, 458 U.S. 747, 764–65, 102 S.Ct. 3348, 3358, 73 L.Ed.2d 1113 (1982); *Pope v. Illinois*, — U.S. —, 107 S.Ct. 1918, 1921, 95 L.Ed.2d 439 (1987).

The prevailing definition of obscenity remains, of course, that of *Miller v. California*. The government attempts to resolve the definitional difficulty by tracking *Miller* in its subpoena and by describing specific sexual acts. In my judgment, this approach encounters several difficulties. I do not understand the *Miller* standard to be purely prescriptive, at least for the terms of a grand jury subpoena. It was designed for use by a trier of fact evaluating a specific film, not for a grand jury trying to corral specific categories of films.

Moreover, the subpoena here lacks several *Miller* safeguards. Under the *Miller* test, a film is obscene if the average person, applying contemporary standards, would find that the film, taken as a whole, appeals to the prurient interest; if the film depicts patently offensive sexual conduct as defined by state law; and if the film, taken as a whole, lacks serious literary, artistic, political, or scientific value. *Miller v. California*, 413 U.S. 15, 24, 93 S.Ct. 2607, 2615, 37 L.Ed.2d 419 (1973); *See also Pope v. Illinois*, — U.S. —, 107 S.Ct. 1918, 1921, 95 L.Ed.2d 439 (1987) (applying a reasonable person standard to the third *Miller* requirement). While the subpoena describes certain "patently offensive [sexual] conduct," the requirement that the film, as a whole, lack literary or artistic merit is nowhere in evidence. Nor is there a requirement that the film, as a whole, appeal to the prurient interest.

These various shortcomings preclude, in my judgment, the simple enforcement of this subpoena on the authority of *Miller*. They do not, however, justify the sweeping invalidation of the subpoena ordered by the majority. Much of the subpoena demonstrates the strong probability of obtaining highly relevant criminal evidence.

If any film is substantially related to an obscenity investigation, it is a film of bestiality, sado-masochistic sexual abuse, or child pornography. *See New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). Congress has specifically targeted child pornography by prohibiting the advertisement or distribution of any depiction of a child engaged in sexually explicit conduct. 18 U.S.C.A. §§ 2251–52 (West Supp.1987). These portions of the subpoena simply do not suffer the problems of substantial overbreadth which would cause the Supreme Court to invalidate them. *See Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). Thus, the subpoena's request for films with scenes of bestiality, sadistic or masochistic abuse, or minors engaged in any sexual exhibition or activity should be upheld.

Similarly, I would allow the grand jury to subpoena films involving masturbation and the specified forms of sexual intercourse. By listing these specific sexual acts, the grand jury has limited its subpoena to the mechanical depictions of sexual activity and abuse that usually appear solely in hardcore pornography. Such sexual activity is obviously not synonymous with obscenity, but it is a *sine qua non*. By quashing any subpoena that targets specifically the filmed depiction of the sexual practices most likely to be associated with obscenity, the majority has seriously impaired the grand jury from accomplishing the investigative purposes that Congress entrusted to it.

On the other hand, the grand jury has subpoenaed films containing lascivious or lewd exhibitions of the genitals or pubic area. Divorced from the *Miller* safeguards and the *Miller* context, this portion of the subpoena might apply to any film that contains a scene of physical nudity or intimate affection. Sex may be a *sine qua non* of obscenity, but it is hardly synonymous with it. Great works of art illustrate the grace and beauty of the human body, even as there remains the potential for prurient exploitation of it. The line between the two is often difficult to draw; here, if anywhere, "one man's vulgarity is another's lyric." *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). Because this portion of the subpoena may easily apply to films that are not substantially related to an obscenity investigation, it should be quashed.

## C.

The third and final requirement is that a grand jury subpoena not be unduly burdensome. The First Amendment prevents the grand jury from either requesting an excessive number of tapes or from issuing a subpoena with overly vague terms.[1] See *In re Klein*, 776 F.2d 628, 635 (7th Cir. 1985); *In re Rabbinical Seminary*, 450 F.Supp. 1078, 1084 (E.D.N.Y.1978). A vague subpoena would require the distributor to implement a subjective legal standard, which he is poorly trained to do, and would ultimately force the distributor to choose between producing any film that may conceivably be obscene or assuming the risk of a subsequent contempt proceeding for inadequate compliance.

An appellate court does not need findings of fact to determine whether a subpoena's terms are overly vague. The majority apparently believes that the subpoena would be more precise if it requested specific titles rather than specific acts. The request for films with bestiality, masturbation, and specific forms of intercourse, however, is not vague; these are specific acts that are readily identifiable.[2] This portion of the subpoena leaves no doubt about what films are involved. A distributor may have to look for these acts, but he will know them when he sees them.

The subpoena's request for films with lewd or lascivious exhibitions of the genitals or pubic area, however, is too vague. This section requires a film distributor to make a subjective decision about when an exhibition is lewd or lascivious and when it is not. The vice of a vague subpoena is that it may require a seller or distributor to surrender protected items. Because this request forces a distributor into overcompliance to avoid a contempt charge, it should be quashed. "When First Amendment interests are at stake, the government must use a scapel, not an ax." *Bursey*, 466 F.2d at 1088.

## III.

Obscenity law is a persistent area of tension. There will always be a public clamor to curb the degradation of human dignity and the exploitation of sexual expression that pornography represents. There will always be the danger that popular attempts to supress it will bring down the censor's hand upon protected speech. There must always be courts to draw difficult lines, no matter how frustrating the attempt. Because the majority forsakes that task for a broad and blanket condemnation of this subpoena, I respectfully submit this separate statement.

1. The burden imposed by a request for an excessive number of obscene tapes is different than the burden posed by a vaguely worded subpoena. The burdensomeness of a request on a particular distributor is primarily a factual inquiry; the burdensomeness caused by the vagueness of a subpoena is primarily a question of law. By announcing on appeal that even the specifically-drawn portions of this subpoena are excessively burdensome, the majority has not only usurped the role of district courts, but provided distributors of any size with almost a per se defense against subpoenas whose terms are in no way overbroad or vague.

    I cannot tell from this record whether compliance with this subpoena would be excessively burdensome on these defendants. The district court never made a finding on the number of films involved; Model and the government apparently disagree on the total number, with estimates ranging from 313 to over 2,000 tapes. In addition, there has been no finding on how difficult it would be for Metro and Model to screen their inventory of sexually explicit tapes. The distributors may or may not already know the contents of each video cassette, either from the display or from prescreening the films to satisfy future customer requests. When the record is undeveloped, an appellate court is a particularly poor place to judge this aspect of the burdensomeness inquiry, which emphasizes fact finding and is best resolved by the district court in its traditional role as supervisor of the grand jury. *In re Grand Jury Matters*, 751 F.2d 13, 16 (1st Cir.1984).

2. Although it may be argued that the request for X-rated films with sadistic and masochistic sexual abuse is vague, that portion of the subpoena should be upheld. The government has an undeniably compelling interest in prosecuting the sale of such dehumanizing films that outweighs the burden on the film distributors.